2023 IL App (1st) 181821-U

No. 1-18-1821

Order filed October 26, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 CR 6582 |
| MATTHEW TYLER, | ) | |
| | ) | Honorable Colleen Hyland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant Matthew Tyler's right to a fair trial was not violated when the trial court properly allowed victim Larreese Smith to testify regarding the shooter's statement and correctly denied Tyler's request for a suppression hearing. The trial court did not abuse its discretion in denying Tyler's request for a mistrial.

¶ 2    Nineteen-year-old Larreese Smith's late night summer walk turned to tragedy when shots rang out in a Roseland alley on June 23, 2012. Smith's Friday evening, which began on a date with a young lady, culminated in nine gunshot wounds, a harrowing four week stay at Christ Hospital, seven surgeries, and a premature end to his upcoming college football career.

¶ 3    The trial proceedings focused on the identity of Smith's shooter, with the State presenting testimony from Smith positively identifying Matthew Tyler as the perpetrator, and from an eyewitness who previously identified Tyler as the shooter but recanted on the eve of trial. This testimony was countered by the defense expert's assertion that eyewitness testimony is not always reliable. At the close of trial, the jury found Tyler guilty of attempted first degree murder causing great bodily harm and permanent disfigurement. Tyler was ultimately sentenced to a prison term of 55 years.

¶ 4    Tyler appeals, arguing the trial court erred when it allowed Smith to testify regarding the shooter's "gang" statement. Further, Tyler contends the court erred in improperly denying his request for a suppression hearing and his request for a mistrial. We affirm.[1]

¶ 5                                    I. BACKGROUND

¶ 6                                    A. Gang Evidence

¶ 7    Prior to trial, the State filed a motion to admit gang evidence through Smith's testimony, arguing Tyler's pre-shooting statement, "[w]hat's up, un?" was imperative to demonstrate Tyler's motive for the attempted murder and his intent to kill Smith. At a July 2015 pretrial hearing, the court heard argument on the motion. The State sought to admit testimony from Smith regarding the shooter's statement, "[w]hat's up, un?" prior to the shooting, as well as Smith's knowledge that "un" meant "Unplugged Thug." Further, the State proffered that Smith would explain that the area of 110th and 111th Streets on Edbrooke Avenue—where Tyler resides—is Dark Side Black Disciple Gang territory. The State argued that this testimony is important for extrapolating a motive to explain an otherwise inexplicable act. Alternatively, the State contended that if the court

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

were to find the evidence inadmissible as to establishing motive, it should nonetheless admit the evidence because it is relevant and intrinsic to the charged offense. The defense countered that the testimony is improper where the State could neither establish Tyler as a gang member nor ascertain a nexus between a gang and a motive or common purpose. Defense counsel further argued there was not a proper basis of knowledge for Smith to testify to the meaning of "un," and that the evidence was far more prejudicial than probative.

¶ 8        Following arguments, the trial court denied the State's motion as it related to motive; however, the court agreed with the State that the shooter's statement and Smith's interpretation of what it meant was relevant and therefore admissible, subject to a proper foundation being laid.

¶ 9                                    B. Motion to Dismiss

¶ 10       On the day before trial, the State provided Tyler with a notice of disclosure indicating that witness Earvin Gravely claimed Smith told him who to pick as the shooter in a March 13, 2013 lineup. Upon receiving the disclosure, defense counsel requested leave to file a "Motion to Dismiss and/or other Alternative Relief." Claiming the case was "tainted," counsel requested that either the charges against Tyler be dismissed, or the court hold a hearing on a motion to suppress Gravely's identification. Counsel specifically argued that Tyler's due process rights were violated because a police officer allowed the victim to return to the room where the eyewitnesses who had not yet viewed the lineup remained—a State action. The State argued the notice of disclosure was similar to the 2016 disclosure[2] Tyler previously received and highlighted that defense counsel chose not

_____

[2]In a February 2016 disclosure, the State informed Tyler that witnesses Tamia Hall, Bryhada Poe, and Cierra Spivey had claimed that, while they were at the police station to view a physical lineup, Smith returned to the room where the witnesses were waiting and told them who to pick out of the lineup. Their claims were inconsistent regarding which witness they were told to pick or how Smith advised them of who to pick out of the lineup.

to act in response to the first disclosure. The court denied Tyler's motion to dismiss and his request for a motion to suppress identification. In particular, the court ruled:

¶ 11     "this does seem like this is just one more person adding into what the other three women had said, so if you did feel that way, I don't think anyone knows unless the witnesses are called who are going to be called to testify. You said that the State and you were not going to call them. They were listed on the list of witnesses that I read to the jury yesterday, so in my mind they are potential witnesses with that same issue being known to the Defendant for as long as you have been on the case and that person's first notice of disclosure was filed, so you are obviously going to be given an opportunity to cross-examine on this and I imagine there is a lot of ground for you to cover on that."

¶ 12                              C. The State's Case

¶ 13     The State's case consisted of the testimonies of Smith, eyewitness Earvin Gravely, Doctor Jane Lee, former assistant state's attorney (ASA) Allison Sise, Chicago Police Department (CPD) officer Perry Williams, CPD Detective Lawrence Herhold, CPD Sergeant Gregory Stacker[3], and Cook County Sheriff's Office (CCSO) employee Steven Bouffard,  as well as several stipulations.

¶ 14                              1. Smith's Testimony

¶ 15     At 12:45 a.m. on the morning of June 23, 2012, Smith walked a female friend safely to her home from his residence on East 113th Street and South Forest Avenue. As Smith was returning to his residence, he decided to walk through an alley as it provided the shortest route. While hesitant to use the alley, he nonetheless proceeded. As he approached the mouth of the alley, a

---

[3]Stacker was an officer in 2009 but was a sergeant by the time of trial.

Monte Carlo automobile drove towards him from the opposite side of the street. When the Monte Carlo was approximately 8-12 feet away, the car stopped with the passenger side of the car closest to Smith. Through the lowered passenger window, Smith observed Matthew Tyler—whom he had known for many years—seated next to the driver, whom he did not recognize. Smith referred to Tyler as "Mack" or "Matt," and explained Tyler had been best friends with his cousin Derrick Wilkerson,  prior to his cousin's death in June 2012. Smith had seen Tyler approximately twice a week in the years prior to the shooting, but they did not speak to each other, outside of the occasional cursory greeting. Smith described the driver as "[a] dark skin fellow, [with] dreads in his hair." He explained that neither the police nor any ASA had previously asked him to give a description of the driver.

¶ 16    Tyler spoke to Smith, asking, "[w]hat's up, un?" While Smith is not a gang member, he—as a lifelong resident of Roseland whose brother is in the gang Unplugged Thugs—knew "un" referred to "Unplugged Thug." After Smith responded "what," the exchange ended. Smith acknowledged on cross-examination that he told Tyler he was going home. Smith's friend Gravely then approached on foot from the direction of 113th Street and Michigan Avenue. Gravely, who was with three women—Tamia Hall, Bryhada Poe, and Cierra Spivey—crossed in front of the Monte Carlo and struck up a conversation with Smith. As they spoke, Smith had his back to the vehicle. The women were standing by the front of the car, on the sidewalk nearest the passenger side. Suddenly, Gravely looked terrified and told Smith to run. Smith turned around and observed Tyler standing outside of the vehicle, pointing a handgun at him from approximately five to eight feet away. Smith explained on cross-examination that, when he first observed Tyler with the silver and black handgun in his right hand, Tyler was approximately 10-12 feet away. He heard the driver state, "blast him," and Smith attempted to run. However, after only one step, Smith was struck by

a bullet and fell to his knees. As Smith fought to stand, he was shot twice more and the slippers he was wearing fell off. While curling his body into a fetal position and futilely attempting to protect his head with his left arm, Smith watched Tyler continue to fire the gun from about four to five feet away. Each fired bullet struck Smith's body, as he turned his head and lay flat on his stomach. When the gunfire ceased, Smith looked over his shoulder and observed Tyler, gun in hand, return to the car.

¶ 17    The Monte Carlo departed and Gravely ran to help Smith. As Smith lay bleeding on the pavement, he declared that "Mack" had shot him, and told Gravely to calm down, call an ambulance and Smith's mother, and "get the girls out of there." An ambulance arrived and transported Smith to the emergency room at Christ Hospital, were he lost consciousness. When he regained consciousness the next day, he discovered he had been shot nine times, had a five-inch drain in his stomach, a tube in his mouth, a tube in his nose, and a stomach wound vacuum. Over the next several weeks, Smith underwent numerous surgeries.

¶ 18    Once Smith was lucid and able to communicate, he met with CPD Detective Herhold on July 18, 2012 at the hospital. Smith informed Detective Herhold that the shooter was a light skinned male whom he knew as "Mack" or "Matt," and that the shooter hung out on East 110th and 111th Streets and South Edbrooke Avenue. Two days later, Detective Herhold visited Smith again and showed him a photo array. After viewing the array for a few seconds, Smith—with 100% confidence—identified the photograph of Tyler as the man who shot him.

¶ 19    Smith viewed a physical lineup on March 13, 2013. Upon arriving at the police station, he waited in a small room with Gravely, Hall, Poe, and Spivey. Detective Herhold removed Smith from that room, presented him with a lineup advisory form, and brought him to a different room to view the lineup. Smith observed the lineup for mere seconds before identifying Tyler as the man

who shot him. Detective Herhold subsequently brought Smith to a separate room down the hall where he sat alone. Smith had no communication, via text or in person, with any other witness prior to their viewing of the lineup. He then met with an ASA and gave a statement detailing the shooting. Smith had not seen or spoken with Gravely since that day, but he had briefly spoken to Gravely's stepsister.

¶ 20     Two weeks later Smith testified at a preliminary hearing, identifying Tyler as the shooter. Smith suffered lingering effects from the shooting and developed a lung infection that required additional surgery and another six-week stay in the hospital.

¶ 21                         2. Gravely's Testimony

¶ 22     On June 23, 2012 at roughly one in the morning, Gravely headed home from a trip downtown with his stepsister, her friend, and her cousin. After exiting a bus at Michigan Avenue and 113th Street, Gravely and his companions walked towards the alley between South Indiana and Prairie Avenues. As they approached, Gravely observed a car parked near the alley. He then saw Smith, whom he had known for a couple of years through a dance group, standing near the passenger side of the vehicle. Gravely observed two individuals in the car, but when he was asked if he saw anyone in court that was inside of the car, Gravely stated "Uhm, I don't remember." Gravely stopped to speak with Smith—who was standing approximately 8-10 feet away from the car, facing the vehicle. The driver spoke to Gravely, asking "what's up," and Gravely replied "what's up? What's poppin'?"

¶ 23     As Gravely shook Smith's hand, Gravely stood between Smith and the car, with his back to the vehicle. Suddenly, the passenger of the car began firing a handgun. Neither he nor Smith were carrying a firearm, and no one else fired a gun. Gravely could not remember if the passenger stepped out of the vehicle but thought that the passenger reached out of the window to shoot. The

shooting happened very quickly and Gravely told the three women to run. He did not tell Smith to run. Gravely witnessed Smith get shot in the back and buttocks before Smith fell as he attempted to run away. After the third shot was fired, Gravely registered what was happening and ran, jumping over a nearby gate to flee the gunfire. He could not remember how many shots were fired in total, but once the gunfire ceased, the vehicle drove away. Gravely returned to help Smith, who was losing a lot of blood. He kept pressure on Smith's wounds until the ambulance arrived. Smith told Gravely the name of the person that shot him but Gravely could not recall what it was.

¶ 24     After the ambulance departed, Gravely spoke to Detective Herhold at the scene. While Gravely recalled telling Detective Herhold there were two men in the vehicle, he did not remember telling him that the shooter was a Black male, approximately 19 or 20 years old, with a light complexion and short haircut, nor did he remember describing the driver as a dark complected Black male that was approximately 19-20 years old. Gravely thought the shooter "was light-skinned," but otherwise could not remember any identifying details. He did not know if there was lighting in the alley where the shooting occurred.

¶ 25     Gravely went to the police station on March 13, 2013. Detective Herhold presented him with a lineup advisory form but Gravely did not read it, despite being given the opportunity to review it. He could not remember if the detective went over the document with him prior to the lineup or if he was told that he was not being forced to make an identification. Even though he did not understand the advisory form, he signed it as though he did understand it, without asking for further explanation. Gravely then viewed a physical lineup, where he identified the fourth person as the man who shot Smith. Gravely, however, did not get a good look at the shooter and chose the person Smith told him to pick. He could not recall Smith's exact wording, but averred that Smith told him "what row the person was in and who it was," when they were "in the room at the

place." He did not tell the ASA or detective that Smith directed him who to identify because he "was scared," and "everything was happening so fast." Gravely concedes that, for five years, he did not tell anyone that Smith told him who to identify in the lineup. When confronted with his statement that Smith told him to pick "the middle person," but the middle person was not who he picked, Gravely admitted he may have "said it wrong" because he is "not very good at talking and explaining things how it's suppose to be."

¶ 26    Following the lineup, Gravely spoke to an ASA and another detective about the shooting and gave a voluntary written statement. He did not remember if he reviewed the statement, or if he was allowed to make corrections or changes to it, although he later identified several corrections that were made. He denied telling the ASA that "the person in the passenger seat came out of the car with a gun in his hand." Gravely had conflicting memories regarding whether he told the ASA that the person he identified from the lineup was the person that exited the passenger seat of the car with a gun and shot at Smith. He admitted that when he signed his written statement, he did so because what he told the ASA was true and accurate.

¶ 27    In February 2016, Gravely went over his identifications with ASAs. He did not remember if the ASA asked if anybody told him who to identify or what to say regarding the shooting and lineup. Likewise, he did not remember answering the ASA's questions in the negative.

¶ 28                               3. Lee's Testimony

¶ 29    Doctor Lee, an expert in the field of trauma surgery, was working at Christ Hospital on June 23, 2012, as an on-call trauma surgeon.[4] Smith was brought into the emergency room at approximately 2 a.m. with nine gunshot wounds—two to the right chest, one to the left buttock,

---

[4]The transcript indicates Lee was asked if she was working at Christ Hospital on January 23, 2012. Based on the substance of her testimony and the date of the shooting, we believe the date to be a scrivener's error.

and six to the right back and torso. Smith was resuscitated with fluids, intubated, and had a right chest tube placed to evacuate blood from his chest before undergoing an urgent exploratory laparotomy.[5] He lost a total of five liters of blood and required multiple blood transfusions. During the first surgery Lee performed, she removed part of his colon, put drains in his kidney, treated his liver with a special balloon, fixed his diaphragm, and affixed a vacuum dressing to his open stomach. Subsequently, Smith underwent an additional six procedures and operations, including an angiogram, multiple abdominal surgeries, and chest surgery. Lee removed one bullet during surgery, but five more remained in Smith's body. He stayed in the hospital's intensive care unit for 20 days.

¶ 30                                                4. Sise's Testimony

¶ 31        Former ASA Sise worked in the felony review division of the State's Attorney's Office in March 2013. On March 13, Sise met with Gravely and police Detective Mark DelFavero in a conference room at CPD's Area Two station to discuss Smith's shooting. Following their conversation, Gravely agreed to memorialize his recollections in a typewritten statement. Once the statement was completed, Sise spoke to Gravely alone to inquire how the police officers had treated him, and whether they had attended to his needs. Sise, Gravely, and DelFavero then reviewed Gravely's typewritten statement, making corrections or additions as necessary, and initialing each page.

¶ 32        Sise recited the entirety of Gravely's written statement. Contrary to his trial testimony, Gravely stated the passenger of the car exited the vehicle before shooting at Smith. Gravely viewed

---

[5]Lee explained that intubation means a breathing tube is placed in a person's mouth and connected to a ventilator, or life support machine. Smith remained intubated for fifteen days. A damage control laparotomy, which Smith underwent, means "[you] open the belly" from the breastbone to the pelvis and "address whatever is going to be life-threatening, or bleeding, [and] gross sources of infection."

a lineup on March 13, 2013, and identified Tyler as the shooter.[6] Nobody told him who to pick from the lineup. Gravely's statement did not include information regarding whether Smith told Gravely the shooter's name, but if Gravely had shared that information with her, she would have included it in the statement.

¶ 33 While at the police station, Sise also spoke with Smith, Spivey, Hall, and Poe. However, she did not memorialize any statements from Spivey, Poe, or Hall.

¶ 34         5. Williams's Testimony

¶ 35 In July 2012, CPD officer Williams was working with a specialized unit when he received a request from fellow police officer Nate Godzik to help with a shooting investigation. Godzik gave Williams the nickname of an individual—"Mack" or "Matt"—who frequented the area of Edbrooke Avenue and was believed to be the shooter. Upon investigation, Williams believed that Tyler matched the description he received from Godzik. He then visited two addresses attempting to locate Tyler but was informed Tyler had moved to Michigan.

¶ 36        6. Detective Herhold's Testimony

¶ 37 Detective Herhold investigated Smith's shooting. Upon arriving at approximately 2:10 a.m. on June 23, 2012, he found the crime scene located 10 to 15 feet into the alley between Indiana and Prairie Avenues. The area was very well lit, with four lights immediately nearby.[7] Smith had already been transported to the hospital, but Gravely remained on scene. Gravely described the shooter as a Black male, 19 to 20 years old, with a light complexion and a fade-style haircut. He also described the driver as a 19-to-20-year-old Black male, but with a darker complexion. After ascertaining there were no other present witnesses or pod/video cameras, Detective Herhold visited

---

[6]A photograph of Tyler was attached to the statement.
[7]Three streetlights and a porch light.

Christ Hospital to speak with Smith. However, Detective Herhold was unable to speak with Smith until July 18 due to his various surgeries, medical sedation, and intubation.

¶ 38    On that date, Smith informed Detective Herhold that the man who shot him was named "Matt" or "Mack," had a light complexion, and was often in the area of 111th Street and Edbrooke Avenue. Detective Herhold took Smith's description of the shooter and contacted officer Gadzik with the information. Later, officer Williams called Detective Herhold with the name—Matthew Tyler—of an individual matching Smith's description. Detective Herhold located a photograph of Tyler through the CPD computer system and placed it in a photo array. He brought the photo array to Christ Hospital, where Smith identified Tyler as the shooter. Detective Herhold issued an investigative alert for Tyler.

¶ 39    Nine months later, Tyler was arrested in Chicago. Thereafter, Detective Herhold conducted a physical lineup at Area 2 on March 13, 2013. Before Smith and Gravely viewed the lineup, they were held in a conference room together. However, after Smith viewed the lineup and identified Tyler as the shooter, he was kept alone in a separate room down the hall. Detective Herhold then returned to the conference room and brought Gravely to the lineup room. He did not observe Smith talk to Gravely at any point. Smith did not go out into the hall to talk towards Gravely, nor did he shout down the hallway. Gravely positively identified Tyler as the man who shot Smith. To avoid a "tainted lineup," Detective Herhold ensured that Gravely and Smith did not come into contact with each other after leaving the conference room until after they each independently viewed the lineup. Gravely was never locked in a room, nor was he handcuffed.

¶ 40    Later, in an unrelated incident, a firearm was recovered which matched the fired shell casings from Smith's shooting. This firearm seemed indicative of a "street gun" which is a gun

that is passed "from person to person to person."[8] Based upon the recovery of that handgun, Detective Herhold created a photo array that included an individual named Darius Haden. Upon Smith's viewing of that array, he did not identify anyone as being involved in his shooting. Neither did the other two witnesses identify anyone from that array. Nonetheless, Detective Herhold issued a "no probable cause investigative alert" to ascertain if Haden had any information regarding either the shooting or the firearm. Haden was never arrested or charged in connection with recovery of the firearm.

¶ 41                                                 7. Stacker's Testimony

¶ 42          CPD officer Stacker was working as a tactical officer near 111th Street and Edbrooke Avenue on August 20, 2009 when he encountered Tyler, who informed Stacker that he had been shot at six times on Edbrooke Avenue and had been in the area two weeks prior.

¶ 43                                      8. Bouffard's Testimony and Motion for Mistrial

¶ 44          Bouffard is executive director of the video management unit of the CCSO. He oversees Securus, the "inmate telephone system" that detainees use to place telephone calls. All phone calls and call details are recorded in the Securus system, including, *inter alia*, the personal identification number of each inmate making a call and the time and date of the call. Bouffard identified a compact disk of Tyler's phone calls recorded by the Securus system. Several clips of various phone calls Tyler made were then published to the jury.[9] After a clip from a March 27, 2013 phone call was played, defense counsel raised an objection, and a sidebar was held. Defense counsel—indicating that a barred portion of the clip was played for the jury—asked for a mistrial. Counsel

---

[8]Detective Herhold's initial testimony reflected that a street gun is "passed basically from gang to gang to gang." On objection, the detective changed his testimony to "person to person to person." This second answer was allowed to stand.

[9]The court admonished that "any other voice; a female voice, that you may hear on these tapes; anything that is being said by that female is not to be considered by you for the truth of anything that's being said."

described the barred portion as consisting of a female voice telling Tyler "he shouldn't be sorry for coming back; he should be sorry for what he did." Defense counsel stated "[t]he bell has been rung. It cannot be unrung." The State argued the inadvertent playing was an honest mistake that could be rectified. The court denied the request for a mistrial and noted that it did not believe it was a deliberate mistake. Counsel asked that, in the absence of a mistrial, all the recordings be stricken and that the jurors be admonished not to consider any of the calls. The court declined to strike the recordings but offered to admonish the jury again. The court allowed the State to requeue the clip they were seeking to admit before replaying the allowed portion in its entirety for the jury. Defense counsel stated, in open court, that "it's still being played;" however, the State responded the part of the clip that could be heard was "the part that the court is allowing us to play."

¶ 45                                9. Stipulations

¶ 46                         a. Evidence Technician Rodriguez

¶ 47        Abelardo Rodriguez, CPD evidence technician, processed the scene of Smith's shooting at 2:06 a.m. on June 23, 2012 at 11313 South Indiana Avenue. He photographed the scene and recovered the shell casings and bullets. Once at the police station, he inventoried the shell casings and bullets, sealed them, and placed them into the evidence vault.

¶ 48                          b. Evidence Technician Fiene

¶ 49        CPD evidence technician Harold Fiene visited Christ Hospital on May 2, 2013 to pick up pellet envelopes from the pathology department. The bullets were recovered from Smith's body at the time of his surgery. Fiene inventoried the bullets.

¶ 50                           c. Police Officer Cepeda

¶ 51    On March 13, 2013, CPD officer Cepeda[10] stopped a vehicle for a traffic violation. Tyler was a passenger in the vehicle. Upon running Tyler's name, Cepeda realized there was an active investigative alert with probable cause, and he arrested Tyler.

¶ 52                              d. Forensic Scientist Hanna

¶ 53    Jennifer Hanna is employed by the Illinois State Police Crime Laboratory and is an expert in the forensic science of firearms examination. Hanna examined and analyzed the nine fired cartridge cases from the shooting and concluded they were all fired from the same firearm. Additionally, Hanna examined a Highpoint model CF 380 auto caliber semi-automatic pistol and found it to display rifling characteristics of nine lands and grooves with a left-hand twist.

¶ 54                              D. The Defense's Case

¶ 55    At the close of the State's case, defense counsel made a motion for directed finding, which was denied. The defense's case otherwise consisted of only the testimony of Geoffrey Loftus, PhD., an experimental psychologist and expert in the field of human perception and memory.[11] Tyler chose not to testify.

¶ 56                              1. Loftus's Testimony

¶ 57    Human perception refers to using sense organs to transfer information from the world into the brain. This initial information/memory is then supplemented by later information related to the event in question to create a memory of an event. It is easier to perceive and remember an experience of an individual that you are acquainted with, compared to a stranger. Misrecognition can occur if observation circumstances are poor. The length of time a person has to observe an individual, the length of distance between a person and who they are observing, stress, and lighting conditions may all affect someone's memory of an observation or contribute to a potential

---

[10]The stipulation did not reveal a first name for officer Cepeda.
[11]Loftus was called out of order during the State's case-in-chief.

misrecognition. These factors are relevant to the witness's reliability, not its accuracy. Loftus has learned about human perception and memory solely through observation. He did not visit the scene of the shooting, review any eyewitness statements, or interview any of the witnesses to the shooting.

¶ 58                                    E. Jury Notes

¶ 59        The jury sent out several questions during deliberation. Of relevance, the jury asked, "[i]s there a transcript of the phone calls? We couldn't understand them. If this is not available, can we listen to them again?" In response, the court informed the jury that there was no transcript but—after yet another admonishment regarding the female voice on the audio tapes—allowed the recorded clips to be played again, in court.

¶ 60        At the end of deliberations, the jury found Tyler guilty of two counts of attempted first degree murder and one count of aggravated battery with a firearm. These counts merged.

¶ 61                        F. Motion for New Trial and Sentencing

¶ 62        Following the verdict, Tyler filed a motion for new trial, raising various issues. Of relevance to this appeal, he argued the trial court erred when it allowed Smith to testify that Tyler stated, "what's up un," despite an improper foundation and a ruling barring gang evidence. Tyler also contended the trial court erred when it denied his request for a "suppression hearing and/or a dismissal," and denied his motion for mistrial. After argument, the trial court denied the motion, finding that (1) a hearing was properly conducted outside the presence of the jury to ensure that Smith was able to lay a proper foundation for his knowledge of what the shooter's statement meant; (2) the suppression hearing request was correctly denied where (a) Tyler's argument that it was trial strategy to request the suppression of only Gravely's identification was counter to his claims of wrongful police conduct, (b) there was no State action, (c) there was no proffer regarding the

police facilitating evidence tampering, and (d) Gravely was cross-examined in detail regarding the circumstances of his identification; and (3) the request for mistrial was properly denied where (a) the phone calls were very difficult to hear, (b) it was unclear whether the jury even heard the statement, (c) the jury was admonished, and (d) the admittance was an unintentional mistake by the State.

¶ 63     The court held a sentencing hearing where Tyler was given a prison term of 60 years. Upon a motion for reconsideration, the court resentenced Tyler to 55 years, finding that it had earlier incorrectly admonished Tyler that the maximum sentence was 55 years.

¶ 64                                   II. ANALYSIS

¶ 65     On appeal, Tyler argues that the trial court erred when it improperly (1) allowed Smith to testify that Tyler used "gang slogans" prior to shooting him, (2) denied his request for a suppression hearing, and (3) denied his request for a mistrial.

¶ 66                             A. Smith's Gang Testimony

¶ 67     Tyler first contends that he was denied his right to a fair trial when, despite the court's ruling barring gang evidence, Smith was allowed to testify that Tyler used "gang slogans" prior to shooting him. Specifically, Tyler claims the admission of the statement, "[w]hat's up un?" and Smith's assertion that "un" referred to the Unplugged Thugs, was highly prejudicial. Tyler argues this portion of Smith's testimony did not help to identify the shooter or explain why the shooting occurred. Accordingly, it could only serve to portray Tyler as a gang member, despite the lack of any evidence to support the assertion. In support of this argument, Tyler highlights that Gravely testified he heard the shooter state, "[w]hat's up?" prior to firing the handgun. Tyler contends Gravely's testimony substantiates that Smith could have excluded the word "un"—and by extension his explanation of what he took "un" to mean—from his testimony without any ill effect.

Tyler further alleges that gang evidence "crept into" his case in other ways, which added to the harm caused.

¶ 68    The State responds that Tyler forfeited the argument that gang evidence was improperly admitted when he challenged only Smith's personal knowledge of the meaning of "un" at trial. Similarly, the State emphasizes that, in his motion for new trial, Tyler claimed that "Smith did not have the requisite knowledge to testify regarding the meaning of 'what's up un'."[12] Defense counsel's oral argument in support of the motion likewise stressed the lack of foundation for Smith's testimony. Therefore, the State alleges Tyler's current claim is disparate from his preserved claim and the argument is forfeited. Accordingly, the State argues that we may only review this issue for plain error.

¶ 69    To preserve a claim of error for appellate review, a defendant must both object contemporaneously and raise the issue in a posttrial motion. *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 28 (citing *People v. Williams*, 2013 IL App (1st) 111116, ¶ 106); *People v. Dorsey*, 2023 IL App (1st) 200304, ¶ 66. It is insufficient for the issue to be raised *either* during trial *or* in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Moreover, the objection must be made with specificity. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50. This is because "[a] 'defendant's failure to object at trial rob[s] the trial court of the opportunity to correct the error, and [the] failure to object in a posttrial motion deprive[s] this court of the factual findings that the trial court might have made' " regarding witness credibility, the purported error's effect on the weight of the evidence and, ultimately, the error's potential impact. *Id.* (quoting *People v. Davis*, 378 Ill. App. 3d 1, 10-11 (2007)). A defendant's failure to either object at trial or raise the issue in a posttrial motion results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48.

---

[12]On appeal, Tyler has not raised a foundational issue as to Smith's testimony. Accordingly, this issue is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 70    At trial, Smith testified that Tyler asked him, "[w]hat's up, un?" directly preceding the shooting. Subsequently, the court held a brief hearing outside the jury's presence to substantiate Smith's basis of knowledge for his "un" testimony. Over defense counsel's objection that Smith "hasn't given any basis of knowledge as to how he could come to form that opinion," the trial court ruled that Smith's "un" testimony would be allowed. The court held that Smith lived in the Edbrooke area his entire life, and "has testified as to what his experience is living in that neighborhood; that he had a brother in the same gang and that 'un,' is an abbreviation."

¶ 71    Smith then testified before the jury as follows:

"STATE: What did the Defendant say to you?

SMITH: "What's up, un?"

STATE: And you lived in that area, correct?

SMITH: Correct.

STATE: And how long have you lived in that area?

SMITH: All my life.

STATE: When the Defendant said "what up, un", that's u-n, correct?

SMITH: Correct.

STATE: What did that mean to you?

SMITH: I knew he was talking about a gang.

STATE: What gang is that?

SMITH: Unplugged Thug.

STATE: And "un" is short for Unplugged Thug?

SMITH: Correct.

STATE: Are the Unplugged Thug members a faction of a different gang?

DEFENSE: Objection, Judge.

THE COURT: Sustained. Ask another question.

STATE: Do Unplugged Thugs occupy the area where you live?

SMITH: Yes.

STATE: Are you yourself an Unplugged Thug gang member?

SMITH: No.

STATE: Do you know anybody in your family who is?

SMITH: Yes.

STATE: Who is that?

SMITH: My brother."

¶ 72    Here, the record demonstrates Tyler failed to *specifically* object at trial to the admission of Tyler's use of "gang slogans." Rather, defense counsel objected only to the foundation of Smith's testimony regarding "un," claiming Smith had no basis of knowledge to testify as to what "un" meant. While the record evinces that defense counsel objected once during Smith's testimony, counsel gave no basis for the objection on record, and, in any case, the court sustained the objection. As Tyler failed to make a *specific* objection, the trial court was not on notice to the nature of Tyler's objection to the admission of the "gang slogan." This is further supported by the fact that the trial court, in ruling on Smith's testimony, addressed only whether a proper foundation for Smith's basis of knowledge had been laid. Tyler arguably raised the issue in his original motion for new trial, when he noted that the court's earlier ruling allowing gang evidence was over the defense's written objection, and claimed Smith should not have been allowed to testify regarding the purported gang connotations of "un." However, Tyler's supplemental motion for new trial raised no such *specific* objection, merely arguing the foundation for Smith's testimony was

improperly laid. In any case, Tyler's objection at trial was insufficient to preserve the gang evidence issue. Therefore, we find he has forfeited review of this issue and turn to the plain error doctrine.

¶ 73    Under certain circumstances, the plain error doctrine permits review of an otherwise forfeited claim of error. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). The doctrine allows this court to address clear and obvious errors that were unpreserved at the trial level. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant must show either that (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) Reese, 2017 IL 120011, ¶ 60. The defendant has the burden of persuasion under both prongs of the plain error doctrine. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The first step in our analysis is to determine whether there was any error. *Piatkowski*, 225 Ill. 2d at 565. Absent any clear or obvious error, there can be no plain error and the defendant's forfeiture will be honored. *People v. Naylor*, 229 Ill. 2d 584, 602 (2008); *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 74    The State claims Tyler's argument fails on plain error review, where no clear or obvious error occurred when the court properly admitted Smith's "un" testimony. The statement was relevant, the State argues, and strengthened Smith's subsequent identification by demonstrating that Smith interacted with Tyler prior to the shooting. Therefore, his identification was more reliable. Additionally, the casual nature of the conversation explains why Smith was "not worried" and felt comfortable enough to turn his back to Tyler.

¶ 75　　　Tyler counters that he properly preserved the issue for review. A defendant forfeits plain error review if they fail to request it. *Hillier*, 237 Ill 2d 539, 545-46. While Tyler does not explicitly request plain error review, he does address the State's plain error argument in his reply brief and asserts the State's argument that he cannot establish plain error is incorrect where the evidence at trial was closely balanced and "Smith's identification was all the prosecution really had against Tyler." See *People v. Williams*, 193 Ill. 2d 306, 348 (2000) (a defendant may request plain error review for the first time in a reply brief). Tyler argues we should review the trial court's decision *de novo*, while conceding that a judge's decision to allow evidence may be accorded deference under an abuse of discretion standard, where the court made factual findings triggering the standard. Although we deem it appropriate to consider Tyler's argument under plain error review, we conclude that no plain error resulted from the circuit court's admission of Smith's "un" testimony.

¶ 76　　　Generally, evidence is admissible if it is relevant. *People v. Bryant*, 391 Ill.App.3d 228, 244 (2009). " '[E]vidence is relevant if it tends to make the existence of any fact in consequence more or less probable than it would be without the evidence.' " *Id*. (quoting *People v. Beaman*, 229 Ill. 2d 56, 75–76 (2008)). Nonetheless, relevant evidence may be excluded if it could potentially mislead a jury or is unfairly prejudicial. *Swift v. Schleicher*, 2017 IL App (2d) 170218, ¶ 78. "Alleged evidentiary errors are reviewed for an abuse of discretion." *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 53 (citing *People v. Reid*, 179 Ill. 2d 297, 313 (1997)). A trial court abuses its discretion only when (1) its decision is arbitrary, fanciful, or unreasonable, or (2) no reasonable person would take the view adopted by the court. *People v. Towns*, 2020 IL App (1st) 171145, ¶ 44.

¶ 77      In the present case, the trial court, in ruling on the State's motion *in limine*, acknowledged that nothing had been proffered to link Tyler to a gang other than the fact of the shooting. Thus, the court appropriately denied the State's motion to introduce gang evidence to establish motive when there was "not enough of a nexus" between Tyler and the evidence the State sought to admit. However, the court allowed Smith's testimony regarding the comment made preceding the shooting, properly recognizing that the pivotal issue at trial was the reliability of Smith's identification of Tyler as the shooter. In fact, Tyler's entire defense revolved around the unreliability of eyewitness identifications and the potential for misrecognition in stressful situations. Undoubtedly, the accuracy of Smith's description of the shooter and the events preceding the shooting was of utmost importance. We find persuasive the State's argument that the admitted "gang" evidence was relevant because it strengthened Smith's identification testimony. See *People v. Gonzalez*, 142 Ill. 2d 481, 488 (1991).

¶ 78      At trial, the crux of defense expert Loftus's testimony revolved around how unreliable eyewitness recollections are and how individuals can misrecognize a stranger as an acquaintance, since it is easier to perceive and remember an experience of an individual that one is acquainted with. Allowing Smith's testimony regarding Tyler's comment, "[w]hat's up, un?" and what he took "un" to mean, buoyed the reliability of Smith's identification. It supported Smith's testimony that the interaction prior to the shooting was long enough—and at a close enough distance—for him to clearly observe and recognize Tyler. Smith had been acquainted with Tyler for years and spoke with Tyler mere minutes before he was shot. Smith's testimony highlighted the shooting was not analogous to the hypothetical situation in Loftus's testimony, where a person observed an individual from a block away and mistakenly took them to be an acquaintance. As the court clearly stated in its ruling on the State's motion *in limine*, it found Smith's testimony to be relevant. The

court further noted it was impossible to "have the facts change as to what the victim heard and what the victim saw."

¶ 79    The trial court carefully weighed the evidence to prevent the potential for prejudice while allowing relevant testimony to stand. We cannot say the court's ruling was arbitrary, unreasonable, or fanciful, nor that no reasonable person would take the trial court's view. Because we have concluded there was no error, there can be no plain error. See *People v. Lewis,* 2019 IL App (1st) 160705, ¶ 36.

¶ 80                                      B. Suppression Hearing

¶ 81    Tyler next argues that the trial court violated his right to a fair trial when it denied his request for a suppression hearing. He contends a full and fair hearing should have been held to determine if Gravely's lineup identification was the product of "undue or suggestive police procedures." Tyler alleges the court's failure to provide the hearing deprived him of his due process right. In support of this argument, Tyler cites to *People v. Robinson*, 46 Ill. 2d 229 (1970), for the proposition that a defendant "has a near absolute right to have a hearing on a motion to suppress an identification." As above, Tyler asks us to review the trial court's decision *de novo*, since he claims the court's decision did not turn on factual findings.

¶ 82    The State replies that Tyler's request was properly denied where it was made on the day of trial. According to the relevant statute, suppression motions "shall be made before trial unless opportunity therefor does not exist or the defendant was not aware of the grounds for the motion." 725 ILCS 5/114-11(g); 5/114-12(c) (West 2018). Moreover, the State alleges a "mere recantation" of one witness on the eve of trial does not warrant a suppression hearing. The state contends the trial court correctly recognized the only issue raised was the credibility of Gravely's pretrial identification in light of his recantation. As such, the jury appropriately resolved the conflict of

Gravely's credibility. The State further submits that any prejudice to Tyler was mitigated by defense counsel's cross-examination of Gravely. The State argues this court should review the trial court's decision under an abuse of discretion standard.

¶ 83    It is within the trial court's discretion whether to entertain a motion to suppress that is made after a trial has begun. See *People v. Bier*, 213 Ill. App. 3d 303, 306 (1991) (trial court did not abuse its discretion in rejecting defendant's motion to suppress filed the morning of trial); *cf. People v. Hoffman*, 84 Ill. 2d 480, (1981) (it is within the trial court's discretion whether to entertain a late motion to suppress evidence based on violation of *Miranda* principles). As aforementioned, a court abuses its discretion when its rulings are arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the court. *People v. Cross*, 2022 IL 127907, ¶ 24. The Code of Criminal Procedure prescribes that a motion to suppress "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." 725 ILCS 5/114-12(c); 5/114-11(g) (West 2018); see *People v. Mitchell*, 234 Ill. App. 3d 912, 920 (1992) (motions to suppress must be made prior to trial unless fundamental fairness dictates otherwise, as when the defense did not have adequate notice of the grounds for the motion).

¶ 84    Initially, Tyler cites *Robinson*, 46 Ill. 2d 229 (1970), in support of his assertion that a defendant has a "near absolute right" to hold a suppression hearing. However, *Robinson* stands for no such proposition. Rather, the court in *Robinson* held that—based on the circumstances in that case—there was "no question" that the defendant had "a right to a fair and impartial hearing" to determine the basis of the witness's identification. *Id*. at 231-32. It is well settled that if a suppression hearing is held, a defendant has "a right to a fair and impartial hearing to determine whether an eyewitness's identification was the product of undue or suggestive police procedures."

*People v. Smith*, 362 Ill. App. 3d 1062, 1075 (2005). However, the issue here is whether there was error in denying Tyler's request for a suppression hearing, not whether he received a fair suppression hearing.

¶ 85       In the instant case, we agree with the trial court that Tyler's request for a suppression hearing on Gravely's lineup identification was untimely. The trial court denied the request because it was first raised on the morning of trial. Tyler argues that only upon receiving the notice of disclosure regarding Gravely's recantation could he reasonably be expected to request a suppression of Gravely's lineup identification. Were it not for the State's prior 2016 notice of disclosure to Tyler, we would agree. Tyler was informed of possible grounds for a motion to suppress when he received the State's notice of disclosure, which was filed over a year prior to trial. Specifically, he was alerted by the State that Hall, Poe, and Spivey each individually claimed they were told by Smith who to identify from the lineup as the shooter. Compare *People v. Sampson*, 86 Ill. App. 3d 687 (1980) (finding that defendant's morning of trial request for a suppression hearing was timely when defense counsel was unaware of the grounds for the motion prior to receiving a second police report indicating there had been no immediate positive identification of defendant at the time of the lineup).

¶ 86       While the prior disclosure concerned Hall, Poe, and Spivey, rather than Gravely, the crux of the issue remains the same. All three women stated that the witnesses were together at the same day and time at the police station to view the lineup. All three women also related that Smith returned to the room with all the witnesses after viewing the lineup and informed the witnesses who to identify as the shooter.[13] While the women's statements were contradictory, their accounts

---

[13]The disclosure notes that "[w]itness Hall stated that after witness Smith returned from viewing the lineup, he was brought back to the room where witness Hall and other witnesses were located, and witness Smith told witness Hall and the other witnesses to pick number 4." However, after "Hall was made

still put Tyler on notice that it was alleged that Smith entered the room with the other witnesses and told them who to identify. While Tyler may not have known that Gravely specifically would recant his identification and accuse Smith of tainting the lineup, he knew that Gravely was in the same small room when Smith was alleged to have entered and directed the witnesses who to choose.

¶ 87        Tyler attempts to justify his absence of an earlier motion by explaining that defense counsel did not request a suppression hearing for the women's identifications because "there was no point in suppressing identifications that the State had no intention on using." But Tyler had no way of knowing prior to trial that the State did not intend to call the women as witnesses. In discussing motions *in limine* prior to jury selection on the day of trial, the State indicated, for the first time, that it did not intend on calling the three women to testify. He further argues that Gravely was, unlike the women, an important witness for the State. Tyler highlights that Gravely was the subject of a material witness warrant, was friends with Smith, and observed how the shooting unfolded. Either way, he reiterates that it was defense counsel's purview whose disclosure to seek a suppression hearing for. It is true counsel made a strategic decision not to request suppression of the women's identifications in the year and a half preceding the trial. Whether that is because he did not believe they would be called as witnesses at trial or for some other reason, it is of no moment. In any event, defense counsel's reasons for being unconcerned with suppressing the women's identifications are not relevant to this issue. What *is* relevant is that Tyler was put on notice in 2016 of the allegations that Smith entered the room with the witnesses and told them who to identify prior to their viewing of the lineup.

_____

aware that other witnesses completely contradict her allegation," she stated Smith texted her who to pick from the lineup.

¶ 88    As Tyler highlights in his reply brief, "trial counsel asked the judge to hold a hearing to suppress Gravely's identification *** because it was improperly procured, due to the failure of the police to separate people during the physical lineup procedure." However, Tyler cannot have it both ways. He cannot, on the one hand, claim he wished to suppress Gravely's identification because of improper police conduct and, on the other hand, argue the State's first disclosure—which alleged the same improper procedure—did not put him on notice of the grounds of his motion. Clearly, Tyler was made *aware of the grounds for the motion* well before the eve of trial. 725 ILCS 5/114-11(g); 5/114-12(c). For the above reasons, we find Tyler's request for a suppression hearing was untimely. See *People v. Colon*, 9 Ill. App. 3d 989, 996 (1973) (finding defendant's motion for suppression hearing untimely where it did not appear that defendant lacked the opportunity to make his motion or that he was unaware of the grounds for its support). Accordingly, the trial court properly denied Tyler's request for a suppression hearing.

¶ 89    Further, even if we were to find that the trial court erred in denying his request, we would still affirm where any error would be harmless. See *People v. Hopkins*, 52 Ill. 2d 1, 5-6 (1972) (as the defendant was adequately identified by a second witness, the court's error in refusing to conduct a hearing on the defendant's motion to suppress victim's identification was harmless beyond a reasonable doubt); see also *People v. Bentley*, 11 Ill. App. 3d 686, 689 (1973) (failure to conduct a suppression hearing may constitute harmless error where there was an independent basis for the identification).

¶ 90                                    C. Mistrial

¶ 91    Finally, Tyler argues the trial court erred when it denied his request for a mistrial after the State played a barred portion of a jail telephone call at trial. He claims the jurors were "subjected to evidence that [was] so prejudicial no instruction or other remedial step can cure it." Specifically,

Tyler alleges the barred statement was played twice and had a significant incriminating effect because the unknown woman on the call "essentially accus[ed]" Tyler of the charged offense.

¶ 92    The State contends a mistrial was unnecessary where (1) Tyler cannot show that he suffered any prejudice and (2) the trial court quickly cured any potential prejudice. In support of its argument, the State points to the ambiguity of the unknown woman's remark and the jury's note indicating its difficulty understanding the telephone calls.

¶ 93    "A mistrial is proper 'only if there is an occurrence of such character and magnitude as to deprive a party of a fair trial and that party demonstrates actual prejudice.' " *People v. Pinkett*, 2023 IL 127223, ¶ 33, (quoting *People v. Soto*, 2022 IL App (1st) 201208, ¶ 153).

> "To prevail on appeal, [the] defendant must establish that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial; that is, that the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Glover*, 2023 IL App (2d) 220178, ¶ 30 (quoting *People v. Wills*, 153 Ill. App. 3d 328, 339-40 (1987)).

The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion. *Id.* ¶ 31. Denying a request for mistrial "will not be grounds for reversal unless it reasonably appears that at least some of the jurors were prejudiced or influenced to such an extent that the defendant did not receive a fair trial." *People v. Morrow*, 256 Ill. App. 3d 392, 400 (1993).

¶ 94    In the instant case, we find that Tyler cannot demonstrate that he has suffered any prejudice. In its first round of notes, the jury asked, "[d]oes Matthew Tyler have an alibi" and "[i]s there a transcript of the phone calls? We couldn't understand them. If this is not available, can we listen

to them again?" Tyler contends these notes reveal a clear indication the "jurors wanted to consider and would give weight to what was discussed in the phone about his involvement." He alludes to the timing of these two questions, indicating they were somehow related in the juror's minds. We find this argument unpersuasive. Tyler's attempt to read an agenda into or some sort of motivation behind the jury's note is utter speculation. We will not speculate on the reason for the jury's notes. See *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 106; *People v. Spears,* 112 Ill.2d 396, 409 (1986) ("Just as this court does not sit to speculate on issues not before it, nor will this court attempt to metaphysically divine a jury's collective intent from a single question that may well have only embodied the curiosity or concern of a single juror."). Neither will we speculate whether there was a reason the two questions were raised at the same or a similar time.

¶ 95        Further, Tyler's claim that the jury's request to listen to the tapes proves they heard the unknown woman's statement and were "intrigued" is belied by the substance of the jury's note, which indicated the jurors could not understand the phone calls. Moreover, even if they did hear the statement at issue, the trial court admonished the jury prior to the publication of the jail calls. Specifically, the judge stated, "any other voice; a female voice, that you may hear on these tapes; anything that is being said by that female is not to be considered by you for the truth of anything that's being said." After the barred portion of the clip was inadvertently played, the circuit court gave a curative instruction similarly admonishing the jury. The court again gave an admonishment before the tapes were played in the courtroom for the jury during deliberation. These admonishments were at defense counsel's request. Tyler's assumption that the jurors were attempting to consider and give weight to the portion of the clip they were admonished to ignore is nothing more than pure speculation. We presume the jury followed the trial court's instructions.

*People v. Tapley*, 2020 IL App (2d) 190137, ¶ 81 (citing *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 61).

¶ 96          Moreover, contrary to Tyler's assertion, it appears the barred section of the clip was only played for the jury once. After the defense's request for a mistrial, the trial court allowed the State to requeue the portion of the telephone call they were seeking to admit before replaying it for the jury. While defense counsel then stated in open court, "it's still being played" and "[c]learly could be heard in the gallery," the State responded that the part of the clip that could be heard was "the part that the court is allowing us to play." This statement went unchallenged by the defense and the court. Further, when the tapes were played at the juror's request during deliberation, the barred portion was not played aloud.

¶ 97          Last, Tyler argues that as here, in a situation where the jury is exposed to an accusation that the defendant committed the charged offense, jurors are unable to forget it. Here, we agree with the State that the woman's statement, "shouldn't have did what you did" could be ambiguous. The number of times the evidence was heard (once), the ambiguous nature of the statement, and the jury's own contention that they could not understand the recorded phone calls, combined with the court's curative instructions, cured any potential prejudice in this case.

¶ 98          As an aside, even assuming *arguendo* that the court abused its discretion in denying his motion for a mistrial, we would still affirm where we find that there is no reasonable probability that the jury would have acquitted Tyler absent the error. See *Pinkett*, 2023 IL 127223, ¶ 39 ("[a]n evidentiary error is harmless where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original and internal quotation marks omitted.) (quoting *In re E.H.*, 224 Ill. 2d 172, 180 (2006))). The record before us belies Tyler's assertion that the evidence was closely balanced. The victim's identification of the defendant was

clear and unequivocal. We find Smith's acquaintance with Tyler particularly persuasive. Tyler was best friends with Smith's cousin. Before the shooting, Smith saw Tyler two times a week for several years. Smith had an unobstructed opportunity to view Tyler, a man he knew, and spoke with Tyler as he was approximately 5-10 feet away from him on a lit street. Immediately after the shooting, Smith told Gravely that "Mack" or "Matt" was the shooter. Once he awoke in the hospital, he gave Tyler's description to the police. Officer Williams testified that he took the nicknames "Mack" or "Matt" and the area (Edbrooke) and was able to identify Tyler with those descriptors. Smith thereafter positively identified Tyler as the shooter in a photograph array, a lineup, and in court. Gravely also positively identified Tyler as the shooter prior to trial. While Gravely recanted his identification on the eve of trial, the testimony he gave at trial was repeatedly contradictory and fraught with inconsistencies. Additionally, Detective Herhold and former ASA Sise testified consistently with Gravely's prior identification and statement. The jury observed the testimonies of the witnesses and found Smith's identification, and Gravely's previous identification, credible. A witness's credibility is the purview of the factfinder. *People v. Crawford*, 2023 Ill App (4th) 210503, ¶ 34 (noting that inconsistencies between a witness's pretrial identification and trial testimony " 'raise questions of credibility' for the factfinder to resolve when determining the verdict." (quoting *People v. Slim*, 127 Ill. 2d 302, 308 (1989))).

¶ 99        In this case, we find no abuse of discretion where the erroneously admitted evidence was not of such character to deprive Tyler of a fair trial. In any event, we are not persuaded that the result of Tyler's trial would have been any different had the barred portion of the clip not been played for the jury.

¶ 100                                    IV. CONCLUSION

¶ 101         Based on the foregoing reasons, we affirm Tyler's conviction for attempted first degree

murder.

¶ 102         Affirmed.