2023 IL App (2d) 220178
No. 2-22-0178
Opinion filed June 28, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-17 |
| LYNELL P. GLOVER, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant, Lynell P. Glover, was convicted of aggravated battery with a firearm and second degree murder. On direct appeal, he contends, *inter alia*, that his convictions should be reversed and the cause remanded for a new trial due to the trial court's failure to grant defendant's motion for a mistrial after learning that the jury improperly had possession of the State's closing argument PowerPoint presentation during deliberations. For the following reasons, we reverse defendant's convictions and remand the cause to the trial court.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was charged with first degree murder and aggravated battery with a firearm in the shooting death of Anthony Awad, as well as aggravated battery with a firearm against Jonathan

Awad. The matter proceeded to trial wherein the State played People's exhibit No. 1, an audio recording of a 911 call made by defendant at 2:48 a.m. on January 3, 2021. Defendant tells the dispatcher that he had located his stolen Camaro and was following it on Route 12 just past Route 120. Defendant then began shouting, "[d]on't get out of the car! Get back in the fucking car! Get in the car!" As the call was transferred from the Lake Zurich dispatcher to the Lake County Sheriff's Office, indecipherable shouting and commotion can be heard in the background.

¶ 4 The State called Jonathan Awad to testify. Awad recalled that on the morning of December 30, 2020, he was walking down a street in the Round Lake area when his identical twin brother, Anthony,[1] pulled up, driving a stolen Camaro. The boys had run away from their father's home sometime before and had been living out of various vehicles. Jonathan got into the passenger seat. He did not see a gun anywhere in the car. When leaving the Round Lake area, Jonathan noticed a white Chevy Malibu following them closely, trying to make them stop. Defendant was driving the Malibu. Anthony was able to elude defendant but was pursued by Round Lake Beach police shortly thereafter. With lights and sirens on, the police attempted to pull over the stolen Camaro, but Anthony continued driving and eventually eluded pursuit. The boys drove to Chicago and lived out of the Camaro for the next several days.

¶ 5 The boys returned from Chicago to Round Lake Beach on January 2, 2021, and dropped a friend named Brianna at her home sometime between 9 and 10 p.m. They then went to a parking lot next to a Speedway gas station in Volo, still driving the stolen Camaro. After falling asleep for about 90 minutes, they went to the Speedway "because the car was on E." Anthony pulled the car next to a gas pump and proceeded inside with Jonathan still in the car. Jonathan observed Anthony fighting with a man inside the Speedway. Anthony was able to break away and ran back to the

---

[1]Jonathan and Anthony Awad were born on October 24, 2003.

stolen car. Anthony told Jonathan that the man threatened to kill him if he did not turn over the key to the Camaro. The gas tank was still nearly empty when they fled the area.

¶ 6    When leaving the gas station, Jonathan noticed that the man who fought with Anthony got back into his car and was on the phone with someone when he began following the Camaro. They continued to drive around the area before returning to the same parking lot next to the Speedway. They then encountered defendant driving the white Malibu. Defendant was "driving aggressive" and trying to make them "pull over." Anthony attempted to elude defendant, but "the car eventually ran out of gas" and "came to a stop on the side of the road." Defendant stopped the Malibu approximately five feet behind the Camaro.

¶ 7    The boys then decided to run out of the car. Jonathan, from the passenger seat, saw defendant making his way to the car. When Jonathan tried to run away, defendant "hit [Jonathan] with the gun on the side of [his] right head." He described the gun as a "regular black handgun pistol." Standing in front of Jonathan, defendant said, "[d]on't run or I'm going to shoot you guys." Jonathan testified that he and Anthony got into a "little scuffle" with defendant. Jonathan was on top of defendant while Anthony also struggled with him. Jonathan testified that he asked defendant, "[i]f I get off of you, are you going to just let us, me and my brother, walk?" Defendant agreed to let them go but began firing shots in their direction as they attempted to flee toward Platinum Autobody. Jonathan was shot once in the leg. He claimed that the bullet entered his leg from the back and exited the front. When he managed to get up, he started walking to Platinum Autobody and noticed defendant walking back toward the parked cars with what Jonathan believed to be the gun. Anthony had fallen to the ground and had not gotten up.

¶ 8 Police arrived at the scene and encountered Jonathan near Platinum Autobody. People's exhibit No. 25 depicts police body camera footage of Jonathan telling officers there had been a fight and a man had shot him and Anthony.

¶ 9 On cross-examination, Jonathan testified that he and his brother were in possession of the Camaro for five days but failed to ever open the glove compartment. They did, however, look through the trunk to find clothing and shoes. Jonathan stored his cell phone and charger in the Camaro's center console. He maintained that no weapon was in the Camaro during the time they had it. When cross-examined about fleeing from police on December 30, Jonathan admitted that Anthony was driving in excess of 80 miles per hour through residential neighborhoods and that Jonathan gave the pursuing officers the middle finger. When officers came to the hospital to interview Jonathan following the incident, he refused to speak with them. He testified that neither he nor his brother touched the gun during the "little scuffle" with defendant.

¶ 10 Dr. Mark Quis testified that Jonathan was treated for a single gunshot wound that went through his left leg. Dr. Quis was unable to determine which side of the leg the entrance wound was on. Anthony was pronounced dead at the scene. Eimad Zakariya, a forensic pathologist at the Lake County coroner's office, testified that Anthony was shot in the neck, with the bullet entering on the right side and exiting straight across on the left after hitting his jugular vein. Anthony was also shot in the upper right leg, with the bullet entering the back and exiting straight across in the front. A third bullet entered the back of Anthony's lower right leg and exited upward in the front.

¶ 11 Thomas Zawojski, a detective and evidence technician with the Lake County Sheriff's Office, testified that a Ruger LC9 semiautomatic handgun and magazine were found in the sewer at the scene of the shooting. Four shell casings from the Ruger LC9 were found nearby.

Defendant's hands were swabbed for gunshot residue and produced a positive sample. Anthony's hands produced a negative sample. Jonathan's hands were not swabbed.

¶ 12 Lisa Ramos, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, performed a DNA profile from the gun's trigger, which showed "very strong" support for inclusion of defendant's DNA profile (65% of the genetic mixture) and "strong" support for inclusion of both Jonathan's and Anthony's (8% of the genetic mixture for one or both of the identical twins). A DNA profile from the magazine showed "very strong" support for inclusion of defendant's DNA profile, while Jonathan's and Anthony's DNA was excluded.

¶ 13 Detective Lisa LeMons and Detective Kyle McManaway of the Lake County Sheriff's Office interviewed defendant at the criminal investigations division in Waukegan on January 3, 2021, from approximately 6 a.m. to 6 p.m. The interview was admitted into evidence as People's exhibit No. 92 and played for the jury. LeMons acknowledged that defendant had bruising on the right side of his face, an injury to his knee, and a bite mark on his abdomen. During the interview, defendant made a seven-page handwritten statement that was introduced as People's exhibit No. 93. Regarding the shooting, defendant's statement reads as follows:

"Driver hopped out [of the Camaro] with his hands up. I got out then and ran towards him and told him to get on the ground. He refused to do so. So I grabbed his hood and tried to sit him down. The passenger then hopped out and started to run from me and the driver scuffling. The driver yelled out [']don't leave me['] multiple times ***. I continued to wrestle and fight with the driver when the passenger came back and pushed me and the driver down. That's when I [saw] a black handgun [be]cause the passenger flipped over me and the driver during the push. I then grabbed the gun with passenger and we struggled with it while the driver then grabbed my lower body and I fell. I was then on

[the] ground with passenger continuing to wrestle while driver was in my pockets. I ended

up getting most of the gun in control."

Defendant's statement then indicates that he "fired one round at the driver," and, as the passenger

attempted to run, "I took 2-3 shots at him not knowing if I struck him but he fell." Defendant stated

that he dropped the gun and ran "to the police [be]cause I [saw] them coming up the road."

¶ 14    People's exhibit Nos. 23 and 24 contained police body camera video in which defendant

explained that one of the boys attacked him with a gun. He said that he was able to gain control of

the gun but lost control of it after struggling with them. Defendant then stated that he hit one of

the boys with the gun and fired shots at both. He further stated that, after he dropped the gun, the

boys ran away with it.

¶ 15    Defendant first called Timothy Fish, an evidence technician with the Lake County Sheriff's

Office, to testify. Fish testified that the Camaro was found to be "dead in gear" at the scene when

police attempted to start it. The Camaro was taken to the evidence building in Libertyville, where

Fish was able to start the engine with a "jump pack." After the engine started, the gas gauge

indicated that the Camaro was approximately one-eighth full of gasoline.

¶ 16    Lekeya Washington, defendant's common-law wife, testified that she owned a Ruger LC9

semiautomatic pistol and had left it in the glove compartment of the Camaro the night before it

was stolen. She testified that, when she reported to police that the car was stolen,  she had forgotten

having left the gun there.

¶ 17    Defendant testified that the stolen Camaro's driver exited with his hands up when he pulled

his vehicle behind it. Defendant had one foot on the ground and one in the vehicle when he told

the boys to stay in the Camaro. He was on the phone with the 911 dispatcher and wanted the thieves

arrested. The driver started to approach defendant, so he grabbed the driver's hood and attempted

to sweep his feet to get him to sit down. The driver yelled out, "don't leave me, come back, come back." The passenger tackled defendant from behind while defendant had the driver in a headlock. As the passenger was falling forward over defendant's head, he noticed a handgun fall in front of him. Defendant testified that he did not bring a gun to the scene and did not notice the driver wielding a gun during their initial confrontation.

¶ 18     As defendant continued to struggle with the boys, he was punched and bitten before managing to gain control of the gun. Defendant was down on his hands and knees with one of the boys on his back telling him "to just let them go, just let them walk." When he started to get back to his feet, he noticed what he believed to be the driver[2] "trying to cock the handgun, so to speak, pulling on the slide." Defendant then punched the boy holding the gun, and a struggle to regain its possession ensued. Defendant eventually grabbed the gun and unjammed it, and a shot went off. One of the boys punched defendant, so he turned and hit him with the gun. The boy fell and grabbed at defendant's waist. Defendant, still on his knees, fired a second shot toward the ground to get the boy away from him. Defendant then turned toward the other boy and fired two shots in his direction. He testified that he was scared for his life and did not want to hurt the boys.

¶ 19     Defendant admitted that he told police at the scene that the boys ran off with the gun, while telling detectives later that he had dropped it when police arrived.

¶ 20     During closing arguments, the State utilized a 58-slide PowerPoint presentation that interspersed clips of admitted audio and video evidence, including select portions of body camera

---

[2]As the boys were identical twins, defendant had difficulty telling them apart during the confrontation.

footage and defendant's video interview with police. The slides also contained relevant jury instructions and the State's theory of the case.

¶ 21 Following closing arguments, the jury received instructions on self-defense and second degree murder based on unreasonable belief and sudden intense passion resulting from serious provocation. Deliberations began on March 24, 2022. At 10:16 p.m. on March 24, the trial court directed the jury to stop deliberating for the day. On March 25, 2022, at approximately 9:30 a.m., the jury continued deliberations. At 3:20 p.m., the jury sent the following note:

> "Judge, we had a copy of the State's PowerPoint. A deputy removed the disc and said we were not supposed to have it. The PowerPoint had personal notes from the State that were not evidence or facts. Many people formed thoughts after viewing the PowerPoint. Why were we given evidence or information we should not have seen or used[?] This is a problem for some of us. We used the PowerPoint extensively."

After immediately informing the parties about the jury note, the trial court stated:

> "So the record is clear, the State's PowerPoint they used in their closing argument was not with the evidence, it was segregated from the evidence by the State at the close of the trial. It was not with the box that went back to the jury. There was at the end of the deliberation night, there were several different members from the Circuit Clerk's office that were working, and somehow the PowerPoint inadvertently was placed in with all the other evidence apparently. That went back with the jury this morning. When it was discovered that that was there, I directed it be removed.
>
> Now I'm asking the parties to look at it. I believe everything that was on the PowerPoint was already put before the jury, but I'm asking the parties to look at it and bring any motions or thoughts they have to me so that I can properly answer the jury."

¶ 22    Defendant requested a mistrial, arguing that "[t]he jury has actually taken the notes which go beyond just mere demonstrative, but actually have taken the notes and stated in the letter to the Court [that] they've considered them and they've used them extensively. It is beyond repair." Defense counsel acknowledged that the prosecutor's notes on slides 7, 8, 32, and 56 were of a professional nature and consistent with points emphasized in closing, but it maintained that prejudice resulted from the State's arguments being overemphasized. After going over the PowerPoint presentation, the trial court read the content of slides 7, 8, 32, and 56 into the record.

¶ 23    Slide 7 read "A person who has not initially provoked the use of force himself has no duty to attempt to escape the danger by using force against the aggressor" and the slide note read, "DEFENDANT IS INITIAL AGRESSOR SO THIS DOES NOT APPLY!" Slide 8 read,

> "A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than use of force which is likely to cause death or great bodily harm to the other person" (emphasis omitted),

and the slide note read, "Defendant is initial aggressor, and he did not make ANY attempt to escape the situation. His car worked—he could have driven away." Slide 32 was a T-chart comparing defendant's narrative as to who brought the gun and who was the initial aggressor against the State's evidence regarding these two points, and the slide note read,

> "Evidence corroborates what Jonathan told you: 1) 911 call; 2) surveillance from D's phone—1 person seen taking D's car just like Jonathan described; 3) shoe and phone at crime scene match up with what he told you; 4) he said he got hit in the head with the gun

and the ER doctor found a contusion; 5) Brianna Schmidt was with him and didn't see a gun anywhere."

Slide 56 defined defendant's burden of proof regarding mitigating factors necessary to support a finding of guilt as to second degree murder, and the slide note read,

"MITIGATING FACTORS: Once you have a unanimous verdict on first degree murder…you move on to the mitigating factors. DEFENDANT MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE, ONE OF THESE MITIGATING FACTORS TO REDUCE THE CHARGE TO SECOND DEGREE MURDER. IF YOU ARE NOT UNANIMOUS THAT THE DEFENDANT HAS MET THIS BURDEN, THEN YOU MUST SIGN THE GUILTY VERDICT FORM FOR FIRST DEGREE MURDER. IF YOU ARE NOT UNANIMOUS THAT THE DEFENDANT HAS MET THIS BURDEN, THEN IT IS NOT SECOND DEGREE MURDER. IT IS FIRST DEGREE MURDER! **EXPLAIN EACH MITIGATING FACTOR."

¶ 24    The trial court found that the notes in the PowerPoint slides consisted of arguments that the State had made to the jury. The trial court noted that the jury was aware that the notes consisted of arguments, "because they even [said] in the note that they sent out that these are State arguments." It concluded that "all of this is harmless beyond a reasonable doubt." Although defense counsel continued to demand a mistrial, the following note was sent to the jury after discussion between the parties:

"Members of the jury—I have reviewed the PowerPoint presentation. It was presented in its entirety to you during closing arguments. The notes to which you refer were argued to you during closing arguments. I remind you that closing arguments are not evidence and anything that attorneys say to you should be based on the evidence and

reasonable inferences to be drawn from the evidence. Any argument not based on the evidence should be disregarded. Please continue to deliberate."

¶ 25 On March 29, 2022, the jury returned verdicts of not guilty of aggravated battery with a firearm against Jonathan, guilty of aggravated battery with a firearm against Anthony, and guilty of the second degree murder of Anthony. On April 27, 2022, defendant filed a motion for a new trial. On May 11, 2022, the trial court denied the motion, and the matter proceeded to sentencing. The trial court sentenced defendant to 21 years' imprisonment on the Class X aggravated battery with a firearm conviction. It indicated that the second degree murder conviction would merge.

¶ 26 The trial court denied defendant's posttrial motion to reconsider the sentence. Defendant then timely filed this direct appeal.

¶ 27                                    II. ANALYSIS

¶ 28 In this direct appeal, defendant raises several contentions, arguing that his convictions should be reversed and the cause remanded for a new trial. Defendant's contention that the trial court's failure to grant his motion for a mistrial after learning that the jury improperly had possession of the State's closing argument PowerPoint presentation during deliberations is dispositive. As such, we limit our analysis to that issue.

¶ 29 Defendant argues that jury's admittedly extensive use of the State's PowerPoint presentation during deliberations resulted in undue emphasis on the prosecution's theory of the case and compromised the jury's impartiality. Both defendant and the State concede that it was error for the jury to have access to the PowerPoint presentation.

¶ 30 A mistrial should be granted where a grave error has occurred that denies a defendant fundamental fairness, such that continuation of the proceedings would defeat the ends of justice. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009).

"To prevail on appeal, [the] defendant must establish that there was a manifest necessity for the mistrial or that the ends of justice would be defeated by continuance of the trial; that is, that the jury was so influenced and prejudiced that it would not, or could not, be fair and impartial, and the damaging effect of the evidence could not be remedied by admonitions or instructions." *People v. Wills*, 153 Ill. App. 3d 328, 339-40 (1987).

¶ 31     It is inherent in a defendant's right to a fair trial that he receives a trial by an impartial jury free from outside influence. A verdict must be based upon the evidence received in open court and not from other sources. *People v. Talley*, 152 Ill. App. 3d 971, 980 (1987) (citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). The question is whether the jurors have been influenced or prejudiced to the extent that they would not, or could not, be fair and impartial. *Id.* Each case must be determined on its own peculiar facts and circumstances, with due consideration to the nature and character of the allegedly prejudicial material. *Id.* The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion. *Nelson*, 235 Ill. 2d at 435.

¶ 32     It is error to permit the jury to take into the jury room during deliberations any matter that was not admitted into evidence. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). However, not every instance in which extraneous information reaches the jury constitutes reversible error. *People v. Collins*, 351 Ill. App. 3d 175, 179 (2004). When such information does reach the jury, it is presumptively prejudicial, and a defendant needs to show only that the information relates directly to something at issue in the case and that it may have influenced the verdict. *Id.* The burden then shifts to the State to demonstrate that the incident is harmless. *Id.* A verdict may stand only if it is obvious that no prejudice accrued to the defendant. *Id.* at 179-80.

¶ 33     The State avers that our supreme court's holding in *People v. Taylor*, 166 Ill. 2d 414 (1995), controls on the issue of the trial court's failure to grant defendant's motion for a mistrial. In *Taylor*,

a jury found the defendant eligible for a death sentence after his plea of guilty to a first degree murder charge. *Id.* at 418. During deliberations, a copy of a slip opinion in *United States ex rel. Free v. McGinnis*, 818 F. Supp. 1098, 1100 (N.D. Ill. 1992), was inadvertently included among the materials given to the jury when it retired at 11:11 a.m. *Taylor*, 166 Ill. 2d at 437. At approximately 2:30 p.m., the inclusion of the slip opinion was brought to the attention of the trial court. *Id.* It was withdrawn from the jury, and the trial court ascertained that most of the jurors had read the slip opinion. *Id.* at 437-38. The trial court instructed the jurors not to consider the opinion in any way whatsoever in their deliberations. *Id.* at 438. At 5:20 p.m., the jury returned its decision that the defendant was eligible for the death penalty. *Id.*

¶ 34    Our supreme court acknowledged the error of permitting the jury to have access to material not admitted into evidence. *Id.* However, it held that the trial court's instruction should have cured the error, as the jury is presumed to follow the court's instructions, and, further, that the extent of the evidence in aggravation against the defendant rendered the error "harmless beyond a reasonable doubt." *Id.* at 438-39.

¶ 35    While the facts in *Taylor* reveal that the jurors read the improper material, there was nothing to suggest that it may have influenced their decision. In the present case, not only did the jurors have erroneous access to the State's PowerPoint presentation, but many jurors "formed thoughts after viewing the PowerPoint," as its contents were "used *** extensively." Further, the trial court's instructions after discovering the inclusion of the PowerPoint presentation did not direct the jury to disregard the thoughts formed after viewing it in the jury room, because the arguments were considered proper at the time the State delivered them in closing. As such, *Taylor* does not control this issue.

¶ 36    In *People v. Collins*, 351 Ill. App. 3d 175 (2004), the defendant was convicted by jury of first degree murder. In his posttrial motion, the defendant claimed that he was prejudiced when the jury foreman visited the crime scene during the first day of trial testimony. *Collins*, 351 Ill. App. 3d at 177. The trial court held an evidentiary hearing in which the juror admitted visiting the scene but denied using any knowledge gained from the visit in leading discussions in the jury room. *Id.* He admitted to the trial court that his visit to the crime scene did aid him in determining the defendant's guilt, because the State's photographs were difficult to view. *Id.* at 178.

¶ 37    On appeal, this court reversed defendant's conviction and remanded for a new trial. *Id.* at 181. The juror acknowledged that the visit had some effect on the ultimate determination of guilt or innocence, and "there are a myriad of subtle ways that it could have affected his verdict." *Id.* at 180. We rejected the State's argument that the defendant was not prejudiced by the juror's visit because any information he may have garnered was cumulative of photographs of the scene, noting that

> "the State bears the burden of showing lack of prejudice. We cannot pretend that the pictures introduced at trial dispelled any prejudice accruing to defendant when [the juror] flatly testified that they were inadequate. Pointing to these pictures is not sufficient to sustain the State's burden in light of his testimony. Second, we attach no significance to the fact that [the juror] did not inform other jurors of his investigation until after they reached a verdict. [He] was a juror, and his personal verdict was necessary to convict defendant." *Id.* at 181.

Because the juror admitted that his consideration of extraneous information aided in his determination of guilt or innocence, the defendant was prejudiced and reversal of the conviction was required. *Id.* at 180.

¶ 38    Applying the *Collins* analysis to the case at bar, we hold that the inclusion of the State's PowerPoint presentation, while properly presented at trial during closing argument, was prejudicial and may have influenced the decision of several jurors who admittedly "formed thoughts" after erroneously viewing it while deliberating. The PowerPoint slides contained selective audio and video clips, as well as the prosecutor's notes designed to bolster the State's theory of the case. The jury had the presentation in the jury room from approximately 9:30 a.m. to 3:20 p.m. on March 25, 2022. This functions as the comparable equivalent of the prosecutor being present in the jury room for nearly six hours, continuing to argue the State's case for the jurors.

¶ 39    Further, the record belies the trial court's assertion that the evidence was not closely balanced. The jury deliberated for four days and submitted numerous questions to the trial court. The jury's verdict illustrates that it believed that defendant was justified in shooting Jonathan but not Anthony. The jury found that mitigating circumstances existed when defendant shot Anthony, as it rejected the first degree murder charge in favor of a conviction of second degree murder. Indeed, our review of the evidence presented reveals that the evidence of defendant's guilt was closely balanced. As such, we cannot agree that the error and resulting prejudice from the improper inclusion of the State's PowerPoint presentation was "harmless beyond a reasonable doubt." The jury's verdict cannot stand because it is far from obvious that no prejudice accrued. We reverse defendant's convictions and remand the cause to the trial court.

¶ 40                              III. CONCLUSION

¶ 41    We reverse the judgment of the circuit court of Lake County and remand the cause for further proceedings.

¶ 42    Reversed and remanded.

*People v. Glover*, **2023 IL App (2d) 220178**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 20-CF-17; the Hon. Mark L. Levitt, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Adam J. Rodriguez, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |