2023 IL App (1st) 201253-U

No. 1-20-1253

Order filed November 22, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 3494 |
| | ) | |
| SHOMARI LEGGHETTE, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first-degree murder where the trial court properly denied his pretrial motion *in limine* to admit certain character evidence of his victim, properly denied his motion for mistrial, properly conducted a hearing on a posttrial *pro se* claim of ineffective assistance of counsel, and properly denied his related request for the appointment of new counsel.

¶ 2    Defendant Shomari Legghette shot and killed Chicago Police Commander Paul Bauer in a stairwell outside of the Thompson Center in downtown Chicago. At a jury trial, defendant argued that he did not know Commander Bauer was a police officer and he had to use force to defend

himself from Commander Bauer's aggressive conduct. Following the trial, the jury found defendant guilty of first-degree murder and armed violence, and it found the State proved that defendant murdered a peace officer in the course of the officer's official duties, and that he knew or should have known Commander Bauer was a peace officer. After merging all of his convictions into one conviction for first-degree murder, the trial court sentenced defendant to natural life imprisonment without the possibility of parole.

¶ 3    On appeal, defendant contends that the trial court: (1) erred by denying his pretrial motion *in limine* to admit certain character evidence of Commander Bauer to support his self-defense claim; (2) erred by denying his motion for a mistrial after the State published a video to the jury that included a prejudicial comment from a Chicago police officer; and (3) failed to conduct a sufficient preliminary inquiry of, or failed to appoint new counsel following, his *pro se* claim of ineffective assistance of counsel for failing to present testimony from a certain eyewitness. For the reasons that follow, we affirm defendant's conviction for first-degree murder.

¶ 4                                    I. BACKGROUND

¶ 5    A grand jury indicted defendant with more than 50 counts related to the February 2018 shooting death of Commander Bauer, including multiple counts of first-degree murder and armed violence. As relevant to this appeal, Count 15 alleged that defendant committed first-degree murder by intentionally or knowingly shooting and killing Commander Bauer without lawful justification while armed with a firearm. Count 15 further alleged that, during the commission of the offense, defendant personally discharged a firearm that proximately caused death. The State also provided notice that it would seek natural life imprisonment for defendant because Commander Bauer was a peace officer killed in the course of his official duties, defendant knew

or should have known that Commander Bauer was a peace officer, and defendant was 18 years of age or older at the time of the murder.

¶ 6    During pretrial proceedings, defendant asserted that he would be raising self-defense at trial. To this end, he filed a motion *in limine* to admit alleged incidents from 1998, 1993 and 1991 to establish that Commander Bauer had a propensity for initiating unreasonably aggressive conduct toward African-American civilians. Following argument, the trial court found the alleged incidents too remote temporally to be relevant to Commander Bauer's character in 2018, and therefore, it denied defendant's motion.

¶ 7    The case proceeded to a jury trial where the State's evidence showed that, in the early afternoon of February 13, 2018, Chicago police officers encountered defendant on Lower Wacker Drive near downtown Chicago appearing to urinate against a wall. The officers attempted to speak with defendant, but he ignored their efforts and ran away. Over radio, the officers asserted that they had lost sight of defendant, and he was seen running from area where a recent shooting had occurred. Commander Bauer apparently heard the radio broadcast, spotted defendant near the Thompson Center, and chased after him. Commander Bauer and defendant became entangled at the top of a stairwell on the southeast side of the Thompson Center. As they were struggling, they both fell down the stairwell. Thereafter, several gunshots rang out from the bottom of the stairwell.

¶ 8    Other police officers immediately responded to the stairwell and arrested defendant, who was wearing a bullet-proof vest, had a firearm with an extended magazine in his jacket pocket and possessed various narcotics. Meanwhile, paramedics tended to Commander Bauer, who had been shot six times and still had his firearm inside his holster. At the time of the shooting, Commander Bauer was wearing a jacket over his police-issued uniform. As a result of the shooting, Commander Bauer died. Forensic analysis revealed that Commander Bauer did not fire his weapon, defendant's

weapon fired several times and defendant's hands tested positive for gunshot residue. After defendant was taken into custody, Chicago Police Officer Anja Bouch transported him to a police station. During Officer Bouch's trial testimony, the trial court admitted, and the State published, video from her body-worn camera, wherein she stated that she wanted to have an additional officer with her to transport defendant because she did not "want to be alone with this guy." This prompted an objection from defense counsel and a motion for mistrial. Although the trial court sustained the objection, it denied the motion for a mistrial.

¶ 9    In the defense's case, it presented evidence that, on the day of the shooting, defendant had lunch with a woman in downtown Chicago and he often wore body armor and carried a firearm. Outside the presence of the jury, defendant informed the trial court that he did not want to testify. Defendant explained that he made the decision because defense counsel failed to present two witnesses he wanted to testify, and defendant blamed defense counsel's failure on a medical issue.

¶ 10    In closing argument, the State contended that defendant shot and killed Commander Bauer knowing he was a police officer purely in an attempt to escape because he could not be apprehended with the firearm and narcotics he possessed. Defense counsel posited that, because Commander Bauer wore a large jacket over his police uniform, defendant did not know Commander Bauer was a police officer. And thus, when Commander Bauer began struggling with defendant, defense counsel asserted that defendant had to use force to defend himself.

¶ 11    Prior to deliberations, the trial court provided the jury with several instructions, including on first-degree murder, second-degree murder and self-defense. The jury ultimately found defendant guilty of first-degree murder and armed violence. It also found the State had proved that, during the commission of the first-degree murder, defendant murdered a peace officer in the course

of performing his official duties and knew, or should have known, Commander Bauer was a peace officer.

¶ 12    Following the jury's verdicts, defendant asserted that he did not want defense counsel representing him at sentencing and raised several *pro se* claims of ineffective assistance of counsel, including that counsel should have presented a witness who would have testified that a police officer had shot down the Thompson Center stairwell. Based on a discussion of the claims with defendant and defense counsel, the trial court rejected them and did not appoint new counsel for defendant. Defense counsel then filed a motion for new trial, which the court denied. The court subsequently merged all of defendant's convictions into one conviction for first-degree murder, which was Count 15, and sentenced him to natural life imprisonment without the possibility of parole.

¶ 13    Defendant appealed, and the trial court appointed the Office of the State Appellate Defender to represent him.

¶ 14                                    II. ANALYSIS

¶ 15    At the outset, we note that, during briefing of this appeal, defendant filed a *pro se* motion attempting to disqualify the Office of the State Appellate Defender as his appellate counsel based on its alleged delay in working on his case and its alleged "fundamental misapprehension of the principles of law required to properly present [his] appeal." In turn, defendant requested the appointment of "a high profile [law] firm" from outside of Illinois to represent him. This court denied defendant's motion and his *pro se* motion to reconsider, but granted him leave to file a *pro se* supplemental brief. Although this court allowed defendant to file that brief, the grant of leave does not bind us and preclude our reconsideration. See *Navigators Specialty Insurance Co. v. Onni*

*Contracting (Chicago), Inc.*, 2022 IL App (1st) 210827, ¶ 7 (finding that prior rulings of this court are not binding and subject to reconsideration).

¶ 16    "[A] defendant has no right to both self-representation and the assistance of counsel," and thus, "no right to present a *pro se* brief in addition to his counsel's brief." *People v. McDonald*, 168 Ill. 2d 420, 435 (1995). "If a defendant is represented by appellate counsel, whether appointed or privately retained, he has no right to a 'hybrid appeal' in which he alternates between being represented by counsel and proceeding *pro se* through the filing of a supplemental *pro se* brief." *People v. Thompson*, 331 Ill. App. 3d 948, 951 (2002). In cases where the defendant has proceeded in this manner, we have struck the *pro se* supplemental brief (see *id.* at 952; *People v. Woods*, 292 Ill. App. 3d 172, 179 (1997); *People v. Lighthall*, 175 Ill. App. 3d 700, 705 (1988)), or disregarded the *pro se* claims in their entirety. See *People v. Morris*, 2013 IL App (1st) 111251, ¶ 81.

¶ 17    In *McDonald*, 168 Ill. 2d at 435, however, while our supreme court noted the impropriety of a hybrid appeal, it nevertheless addressed the claims contained in the defendant's *pro se* filing despite him being represented by appellate counsel because he had been given the death penalty and thus, his "life [was] at stake." In the instant case, defendant received a natural life sentence without the possibility of parole, and thus, his life is not at stake like the defendant in *McDonald*. As such, because defendant is still being represented by appellate counsel, we strike defendant's *pro se* supplemental brief on our own motion. See *Woods*, 292 Ill. App. 3d at 179.

¶ 18                                      A. *Lynch* Motion

¶ 19    Defendant first contends that the trial court erred by denying his pretrial motion *in limine* to admit evidence that Commander Bauer had a propensity for initiating unreasonably aggressive conduct toward African-American civilians to support his self-defense claim.

¶ 20    When defendant filed his motion *in limine*, he asserted that "[m]any African-American citizens would testify that [Commander Bauer] knocked them down or was otherwise violent toward them for no apparent reason." However, defendant did not name potential witnesses or describe the alleged incidents with specificity. As a result, before filing its response, the State requested more detail regarding the alleged incidents. At a hearing on defendant's motion, the State acknowledged receiving an amended answer to discovery that included witnesses who could testify to the alleged incidents, but that amended answer is not included in the record on appeal. Based on the State's written response, these incidents occurred in 1993, when Commander Bauer allegedly used unreasonable force against African-American arrestees, and in 1991, when he allegedly falsely arrested an individual and called the person "a disparaging racial epithet." During argument on defendant's motion, no further information came to light about the specifics of these alleged incidents. Additionally, defense counsel sought to admit an unspecified incident from 1998. That incident was apparently detailed in the defense's amended answer to discovery. Following argument, the trial court found the alleged incidents too remote temporally to be relevant to Commander Bauer's character in 2018 and denied defendant's motion *in limine*.

¶ 21    Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). However, under *People v. Lynch*, 104 Ill. 2d 194, 199-200 (1984), where the defendant raises self-defense, evidence of the victim's aggressive and violent character may be relevant to "support the defendant's version of the facts where there are conflicting accounts of what happened." See also Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011) ("In criminal homicide *** cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the

alleged victim's prior violent conduct."). Even if the character evidence serves an evidentiary purpose under *Lynch*, that evidence may be excluded "on the grounds of relevancy if the evidence is remote, uncertain or speculative." *People v. Morgan*, 197 Ill. 2d 404, 456 (2001). The trial court has broad discretion when ruling on evidentiary issues, and we will not reverse such a ruling unless the court abuses that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). An abuse of discretion occurs when the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 22    In the instant case, the trial court found the incidents from 1998, 1993 and 1991 too remote temporally to have any relevance about Commander Bauer's character in 2018. "Remoteness in time is a valid consideration in determining whether it is reasonable for the trial court to allow the admission of evidence regarding the victim's violent character in a prosecution in which the defendant raises a claim of self-defense." *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 46; see also *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 49 (same). As all of the alleged incidents of Commander Bauer's propensity for initiating unreasonably aggressive conduct toward African-American civilians occurred 20 years or earlier than the date of the shooting, the court's conclusion that the evidence was too remote temporally was not arbitrary, fanciful or unreasonable. See *Martinez*, 2021 IL App (1st) 182553, ¶ 46; *Barnes*, 2017 IL App (1st) 143902, ¶ 49.

¶ 23    Nevertheless, defendant argues that the trial court's remoteness analysis ignored the context of Commander Bauer and his rank within the Chicago Police Department. Defendant claims that, because Commander Bauer was a commander, he was not engaged in enforcement duties, *i.e.*, having regular encounters with civilians. Defendant acknowledges that the record does not reflect the timeline of Commander Bauer's promotions, but asserts that it had likely been a substantial amount of time since a significant part of his work responsibilities consisted of arresting

individuals. Such an argument is problematic for multiple reasons. First, this argument was never made to the trial court. See *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009) ("It is axiomatic that arguments may not be raised for the first time on appeal."). And second, as defendant concedes, there is nothing in the record as to when Commander Bauer became a commander or when his primary police duties shifted from street-level enforcement to something else. Given the absence of these critical facts and the sheer amount of speculation defendant invites us to employ, we have no basis to find the court's ruling unreasonable. Consequently, the trial court did not abuse its discretion in denying defendant's motion *in limine*. See *Illgen*, 145 Ill. 2d at 364.

¶ 24                                     B. Motion for Mistrial

¶ 25     Defendant next contends that the trial court erred by denying his motion for a mistrial after the trial court admitted, and the State published to the jury, the body-worn camera video from Officer Bouch, wherein she stated that she did not want to be alone with defendant while transporting him to the police station. Defendant argues that Officer Bouch's statement constituted unconfronted, unfounded expert opinion testimony regarding his ability to engage in unarmed combat, which went to the core of his self-defense claim.

¶ 26     During trial, Officer Bouch testified about transporting defendant, who was handcuffed and shackled in the back of her police vehicle, back to the police station following his arrest. During her testimony, the State played a portion of her body-worn camera video for the jury, in which she indicated her desire to have an additional officer with her to transport defendant because she did not "want to be alone with this guy." Defense counsel immediately objected, and the trial court held a sidebar outside the presence of the jury. During the sidebar, defense counsel moved for a mistrial based on the video comment. The State acknowledged they had agreed not to ask Officer Bouch during direct examination if she felt uncomfortable being alone while transporting

defendant, but denied there was any agreement concerning the content of the video. The court, however, determined that, if the State was precluded from asking Officer Bouch about being uncomfortable during direct examination, it likewise was improper to show the jury her video comment about being uncomfortable. As such, the court ordered the State to edit the video and remove the improper remark. After the sidebar concluded, the court informed the jury that the video was being edited to remove "irrelevant" information. The court instructed the jury to "disregard what [it] viewed and heard up to this point" and to only consider what was in the edited video, which would be played for the jury in a little bit.

¶ 27 Following this admonition, and back outside the presence of the jury, the trial court considered defendant's motion for a mistrial. The court observed that the video was immediately stopped upon defense counsel's objection, the jury was promptly provided with a curative instruction and the State had already presented 15 or 16 witnesses. The court noted that the State's evidence did not suggest a weakness in its case such that the improper video comment prejudiced defendant's right to a fair trial. The court additionally considered several other factors and ultimately determined there was no manifest necessity to declare a mistrial. Consequently, the court denied defendant's motion for a mistrial. Thereafter, the State played the edited born-worn camera footage from Officer Bouch for the jury.

¶ 28 Initially, defendant concedes that he failed to include this claim of error in his posttrial motion for new trial, resulting in him forfeiting the claim on appeal. See *People v. Jackson*, 2022 IL 127256, ¶ 15. When a defendant forfeits a claim of error, we will only review the claim for plain error. *Id.* ¶ 19. The plain-error doctrine applies: "(1) where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence or (2) when a clear or obvious error is so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process." *Id.* Under both prongs, the defendant has the burden of persuasion. *Id.* Under the doctrine, the first step is to determine whether a clear or obvious error occurred. *Id.* ¶ 21.

¶ 29    "Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). "The question is whether the jurors have been influenced or prejudiced to the extent that they would not, or could not, be fair and impartial." *People v. Glover*, 2023 IL App (2d) 220178, ¶ 31. Each case is unique and must be judged based on its own facts and circumstances, giving "due consideration to the nature and character of the allegedly prejudicial material." *Id.* We review whether the trial court erred in denying a motion for a mistrial for an abuse of discretion. *Bishop*, 218 Ill. 2d at 251.

¶ 30    In this case, the trial court balanced several factors in coming to the conclusion that a mistrial was not warranted. The court's consideration of these several factors demonstrate it evaluated the allegedly prejudicial comment within the context of the case's unique facts and circumstances. See *Glover*, 2023 IL App (2d) 220178, ¶ 31. Critically, the court observed that, upon defense counsel's objection, it sustained the objection by immediately stopping the born-worn camera video and shortly after, provided the jury with a curative instruction. See *People v. Coleman*, 158 Ill. 2d 319, 343 (1994) (where defense counsel objects to improper evidence "and the objection was sustained by the trial court which then instructed the jury to disregard the testimony," such actions cured any potential error). And afterward, the jury watched the edited born-worn camera video without Officer Bouch's comment, and the State made no further references to the comment during trial, thus making the allegedly prejudicial comment isolated.

¶ 31 What's more, the comment at issue was fleeting during the course of a week-long trial where the State presented approximately 25 witnesses and over 100 exhibits. Given the fleeting and isolated nature of the comment, the trial court's prompt sustaining of defense counsel's objection and its curative instruction, the court prevented defendant from being prejudiced by the video comment from Officer Bouch. See *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 85 (the trial court properly denied a motion for mistrial based on a prosecutor's improper comment where the comment "was isolated and fleeting" and the appellate court was "confident that the promptly sustained objection and subsequent jury instruction effectively cured the error and prevented any prejudice to [the] defendant"). Given these circumstances, the trial court's denial of defendant's motion for a mistrial was not arbitrary, fanciful or unreasonable.

¶ 32 Nevertheless, defendant argues that the trial court erred in its analysis of whether a mistrial was warranted because it, in part, used a manifest-necessity standard. As defendant highlights, the manifest-necessity standard did not apply to the circumstances of his case. See *People v. Shoevlin*, 2019 IL App (3d) 170258, ¶ 25 ("[W]hen a trial court declares a mistrial without the defendant's consent, a second trial is prohibited unless the State demonstrates a manifest necessity for the mistrial.") Although the court may have improperly used the term "manifest necessity," the court, in essence, equated that term to whether Officer Bouch's improper video comment juxtaposed with the circumstances of the case necessitated a mistrial, *i.e.*, similar to the correct standard of whether "an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *Bishop*, 218 Ill. 2d at 251. Regardless, we can affirm the trial court's ruling on any basis supported by record even if the court's reasoning was not correct. See *Martinez*, 2021 IL App (1st) 182553, ¶ 37. Given the

circumstances of the case, as discussed above, we find that the court's ultimate conclusion to deny defendant's motion for a mistrial was a proper exercise of discretion.

¶ 33 Additionally, defendant attempts to analogize the jury hearing Officer Bouch's video comment to what occurred in *People v. Hernandez*, 121 Ill. 2d 293 (1988), *People v. Rivera*, 277 Ill. App. 3d 811 (1996) and *People v. Lewis*, 269 Ill. App. 3d 523 (1995), where Illinois courts found that curative instructions did not sufficiently remove the prejudicial effect of juries hearing improper evidence. In *Hernandez*, 121 Ill. 2d at 317-18, the error related to the improper admission of incriminating statements made by a non-testifying codefendant. In *Rivera*, 277 Ill. App. 3d at 817-18, the State elicited hearsay testimony from a police officer that unknown witnesses identified the defendant as one of the perpetrators of a shooting, and the State reminded the jury of the officer's testimony multiple times afterward, including during closing argument. In the instant case, unlike in *Hernandez*, and *Rivera*, the improper comment from Officer Bouch was not directly probative of defendant's guilt. Moreover, in contrast to *Rivera*, the jury heard Officer Bouch's comment one time, rendering the remark isolated and fleeting.

¶ 34 Finally, in *Lewis*, 269 Ill. App. 3d at 526-27, the jury heard from a detective that the victim in a sexual misconduct case had agreed to take a polygraph test, which served to substantially bolster the credibility of the victim at the defendant's expense. This court observed that our supreme court had "repeatedly and emphatically condemned references at trial to polygraph examinations," and "few rules are more established under Illinois law than this prohibition." *Id.* at 527. Under a very liberal viewing of Officer Bouch's comment, it could be seen as diminishing defendant's credibility in the vein of how defendant could pose a danger to an officer despite being handcuffed and shackled. But her comment unequivocally did not have the same direct effect on credibility as a detective informing the jury that a victim agreed to take a polygraph test like in

*Lewis*. See *People v. Jackson*, 202 Ill. 2d 361, 369 (2002) (observing that "the admission of polygraph evidence unjustifiably intrudes on the trier of fact's ability to weigh the credibility of the witnesses").

¶ 35    In the present case, unlike in *Hernandez*, *Rivera* and *Lewis*, the trial court's actions following the jury hearing Officer Bouch's comment, including its curative instruction to the jury, sufficiently cured any potential prejudice to defendant. Consequently, the court did not abuse its discretion in denying defendant's motion for a mistrial (see *Illgen*, 145 Ill. 2d at 364), and he has failed to persuade us that a clear or obvious error occurred necessitating plain-error review. See *Jackson*, 2022 IL 127256, ¶¶ 19, 21.

¶ 36                                      C. *Krankel*

¶ 37    Defendant lastly contends that the trial court erred in denying his *pro se* posttrial motion for the appointment of new counsel where he alleged that defense counsel had been ineffective for failing to present the testimony of Joseph Currie.[1]

¶ 38    On the morning of the second day of defendant's trial outside the presence of the jury, the State informed the trial court that, after opening statements, an unnamed individual contacted its investigator claiming to have been at the scene of the shooting and to have witnessed one or more police officers shooting into the stairwell outside the Thompson Center. According to the State, that individual left his first name and a phone number. In response, defense counsel indicated a desire to speak with this person if possible. Later that day, the State tendered a written report about the claimed witness to the defense. After the jury had been excused for the day, the State alerted the court that an individual named "Joseph Currie" had contacted the City of Chicago's Civilian

---

[1] Currie's last name is also spelled "Curry" in the record, but we will use the spelling of "Currie," as that is how his last name initially appeared in the record.

Office of Police Accountability (COPA) and relayed the same information about witnessing the police shooting into the stairwell. Currie left a phone number and a Minnesota address with COPA. The State's comments about Currie implied that he was the unnamed individual who had contacted its investigator after opening statements.

¶ 39    Following the State's case-in-chief, the trial court admonished defendant about his right to testify. Defendant informed the court that he did not want to testify but explained that he made the decision because defense counsel failed to present the testimony of two unnamed witnesses, which defendant blamed on a medical issue defense counsel had suffered. Once the parties' jury instructions conference ended and before closing arguments began, the court followed up with defendant about the two witnesses. Defendant indicated that one of the witnesses was Currie and the other was Daminnius Guyton.[2] The latter told police that he had been downtown when the shooting occurred. Guyton allegedly observed defendant rob a nearby Starbucks, run out of the shop with a firearm, chase down Commander Bauer and shoot him. In response, defense counsel explained how he tried to contact Guyton and asserted that Currie was supposed to come for an interview, but he failed to show up. Defense counsel stated that he called Currie several times, but never received a response. Defense counsel conceded that defendant wanted him to interview Currie, but Currie "didn't make [himself] available." Defense counsel also denied that any medical issue affected his ability to interview Currie. Following counsel's explanation, the State noted that Currie had a criminal background with prior convictions for making false police reports and theft.

¶ 40    After the jury found defendant guilty, defendant claimed that defense counsel had been "gravely ineffective" and asserted that he did not want defense counsel representing him for

_____

[2] Guyton's last name is also spelled "Guiton" in the record, but we will use the spelling of "Guyton," as that is how his last name initially appeared in the record.

sentencing. The trial court asked defendant to elaborate on his claims, and defendant listed the various ways he believed defense counsel had been ineffective. Among them, defendant alleged defense counsel knew that Special Investigator Thomas Symenski of the Illinois Attorney General's Office, who testified at trial, had shot down the stairwell of the Thompson Center, and covered it up. Defendant claimed there was video evidence showing Investigator Symenski shooting down the stairwell, and asserted that Currie and Guyton witnessed this shooting, but "they never came to Court." In response, defense counsel asserted that he attempted to find Guyton, but could not get in touch with him. And, regardless, defense counsel indicated that, based on Guyton's statement to the police, he would not have been a credible witness. As to the claim that Investigator Symenski shot down the stairwell, defense counsel remarked that he investigated the allegation and reviewed all video discovery available. Based on that review, defense counsel could not substantiate defendant's claim about Investigator Symenski shooting down the stairwell. After a substantial discussion between the court, defendant and defense counsel about defendant's various claims, the court found no merit in them. In relevant part, the court observed that defense counsel could not find video evidence to support defendant's claim about Investigator Symenski. As such, the court declined to appoint new counsel for defendant.

¶ 41 Defendant interjected and observed that defense counsel should have been able to interview Currie, but counsel failed to because of a medical issue. Defense counsel responded that he tried to interview Currie, but could not, and he did not believe Currie was credible. The court and defense counsel continued to discuss an additional claim of defendant's. Then, the court asked defense counsel the name of the other alleged eyewitness to the police shooting down the stairwell, and counsel responded:

"Currie, C-u-r-r-i-e, that's what I recall, that's what I picture in my head of the person I wanted to find. I don't remember why I—my ability to find him or whether I heard it, but I know I wanted to look for the witnesses who would—or any witness who would say that there were police shooting down. There were no witnesses who I could find that might say that, but I did try to find them."

The court asked defense counsel specifically about defendant's claim that a medical issue prevented him from finding Currie. Defense counsel responded: "That's news to me, that Mr. Currie was available at that time and no other time, I have not heard that." After this discussion, the court once again concluded that there was no basis to appoint new counsel for defendant.

¶ 42    In contending that the trial court erred in denying his *pro se* posttrial motion for the appointment of new counsel, defendant argues that, while the court conducted a preliminary inquiry into his claim, defense counsel's explanations for failing to call Currie were inconsistent. As a result, defendant posits that the court's inquiry did not foreclose the possibility that defense counsel neglected his case by failing to present Currie as a witness. And therefore, defendant asserts that the court erred by either failing to conduct a sufficient preliminary inquiry into his claim or failing to appoint him new counsel.

¶ 43    When a defendant raises a posttrial *pro se* claim of ineffective assistance of counsel, the procedures emanating from *People v. Krankel*, 102 Ill. 2d 181 (1984) and its progeny govern. *People v. Roddis*, 2020 IL 124352, ¶ 34. When the defendant raises such a claim, the trial court is not required to automatically appoint new counsel. *Id.* ¶ 35. Rather, the court must first examine the factual basis of the claim. *Id.* In examining the factual basis, the court should discuss the allegations with defense counsel and the defendant. *People v. Ayres*, 2017 IL 120071, ¶ 12. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the

court need not appoint new counsel and may deny the *pro se* motion." *Roddis*, 2020 IL 124352, ¶ 35. But, if the claim shows possible neglect of the defendant's case, the court should appoint new counsel, who then "can independently evaluate the claim and avoid the conflict of interest that trial counsel would have in trying to justify his or her own actions contrary to the defendant's position." *Id.* ¶¶ 35-36. The court can make this determination based upon its discussions with defendant, defense counsel, "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Ayres*, 2017 IL 120071, ¶ 12. We review whether the court properly conducted a preliminary inquiry under *Krankel de novo. People v. Jackson*, 2020 IL 124112, ¶ 98. Alternatively, when the court has reached a determination on the merits of a defendant's *pro se* claim of ineffective assistance of counsel, we will only reverse that determination if there was manifest error, which is an "error that is clearly evident, plain, and indisputable." *Id.*

¶ 44     In this case, the trial court conducted a sufficient inquiry with defendant about his *pro se* claim concerning Currie. After defendant raised several *pro se* claims of ineffective assistance of counsel, the court conducted a thorough evaluation of those claims with defendant and defense counsel, including the one related to Currie. The court gave defendant ample opportunity to present his claim, and its inquiry with defendant and defense counsel provide a detailed factual basis underlying the claim. See *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 40 (finding the trial court conducted a sufficient preliminary inquiry under *Krankel* where "[t]he record shows that [it] made a significant effort to explore [the] defendant's claim *** and gave defendant ample opportunity to present the factual basis of his claim").

¶ 45     Relying on *People v. McCarter*, 385 Ill. App. 3d 919, 942 (2008), defendant posits that when a defendant raises a claim of ineffective assistance of counsel for failing to call a witness, the "court conducting a preliminary investigation under *Krankel* ought to inquire into matters such

as the identities of the witnesses, the substance of their proposed testimony, and the extent to which defendant's counsel knew and acted upon the existence of such witnesses." Although the *McCarter* court made this statement in relation to potential alibi witnesses, which Currie is not, the trial court in the present case nevertheless fulfilled this suggestion. Based on the court's various interactions with defendant about Currie, including some predating the preliminary *Krankel* inquiry, it knew the identity of Currie, knew that he claimed to see a police officer shooting down the stairwell, and knew of defense counsel's actions upon learning about Currie. That is to say, when the court ultimately decided not to appoint new counsel for defendant, it had all the relevant information it needed about Currie as a potential witness.

¶ 46    Defendant also cites *People v. Barnes*, 364 Ill. App. 3d 888 (2006) to support his contention that the trial court failed to conduct a proper preliminary *Krankel* inquiry. In *Barnes*, the defendant alleged that his defense counsel failed to interview potential alibi witnesses. *Id.* at 898. In response, the trial court, without discussing the claim with defense counsel, summarily rejected the claim, finding the issue was a matter of legal strategy between defendant and defense counsel. *Id.* The appellate court found the trial court's preliminary inquiry insufficient because the trial court never inquired "into the substance of the[ ] allegations" and its "brief conclusory review" failed to provide a factual basis sufficient for the court to reject the defendant's claims. *Id.* at 899. In the instant case, unlike in *Barnes*, the trial court did not summarily reject defendant's claim about Currie. Rather, the court thoroughly discussed defendant's claim about Currie, in addition to several other claims, with defendant and defense counsel to provide a detailed factual basis upon which the court could reject the claim. Therefore, the court's preliminary *Krankel* inquiry was sufficient.

¶ 47    Following the trial court's proper preliminary inquiry under *Krankel*, it did not manifestly err in denying defendant the appointment of new counsel. As a general matter, "[d]ecisions concerning what witnesses to call and what evidence to present on a defendant's behalf are viewed as matters of trial strategy." *People v. Munson*, 206 Ill. 2d 104, 139 (2002). And "allegations relat[ing] to trial strategy *** cannot serve as the basis of a *Krankel* claim." *Jackson*, 2020 IL 124112, ¶ 106. Still, the "failure to interview witnesses may indicate" ineffectiveness, "especially where their testimony may be exonerating." *People v. Juarez*, 278 Ill. App. 3d 286, 291 (1996).

¶ 48    Although the trial court never provided specific reasons for rejecting defendant's claim about Currie, it had an ample factual basis to properly reject the claim given defense counsel's assertions, including that he did not believe Currie was a credible witness or that counsel made a reasonable effort to investigate Currie. Indeed, the circumstances of Currie's involvement in the case made defense counsel reasonably believe he was not a credible witness. For one, the first time Currie apparently made a report about being a witness to the shooting was following opening statements in the case in March 2020, more than two years after the actual shooting. Currie's delayed reporting of being a witness supports defense counsel's assertion that he was not credible. See *People v. Carter*, 2017 IL App (1st) 151297, ¶¶ 142-43. Additionally, as defense counsel explained during the preliminary *Krankel* inquiry concerning defendant's claim about Investigator Symenski shooting down the stairwell, there was no video evidence substantiating this claim. Moreover, the police recovered six fired cartridge cases as evidence—five from the scene of the shooting and one from Commander Bauer's clothing—and ballistics testing revealed that all six had been fired by the firearm recovered on defendant. Ballistics testing further revealed that the sole bullet recovered from Commander Bauer's body had been fired by defendant's firearm. It is reasonable to infer that, if no video or ballistics evidence supported the claim about Investigator

Symenski shooting down the stairwell, a witness claiming to see as such would not be credible. Even though defense counsel never interviewed Currie, counsel had a rational belief that Currie was not a credible witness.

¶ 49    As to defense counsel's attempts to interview Currie, admittedly, counsel never did. But the facts surrounding Currie's involvement in the case are critical. He only made himself known to defense counsel immediately after opening statements, thus giving defense counsel a limited opportunity to investigate before the defense's case-in-chief. And during trial proceedings, defense counsel indicated that Currie was supposed to come for an interview but failed to appear. Defense counsel additionally asserted that he called Currie several times but never received a response. Based on the circumstances, defense counsel's actions in attempting to interview Currie were reasonable, especially given his apparent lack of credibility. See *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38 (observing that defense counsel only "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). And thus, the trial court appropriately concluded that defense counsel's actions, or lack thereof, did not show possible neglect of defendant's case warranting the appointment of new counsel. See *Ayres*, 2017 IL 120071, ¶ 12 (stating the trial "court is permitted to make its determination based on its knowledge of defense counsel's performance at trial").

¶ 50    It is true that, during defense counsel's remarks on Currie six months later at the preliminary *Krankel* inquiry, counsel failed to remember parts of his attempts to locate Currie or gave an explanation inconsistent with his previous explanation. But counsel remained adamant that Currie was not a credible witness. Given defense counsel's more contemporaneous remarks concerning his attempts to interview Currie during trial, which the court could rely on (see *id.*), and counsel remaining adamant that Currie was not credible, which as discussed above was a

reasonable conclusion, it is not clearly evident, plain or indisputable that the court erred in rejecting defendant's ineffective assistance of counsel claim regarding Currie. See *Jackson*, 2020 IL 124112, ¶ 98. Consequently, the trial court did not commit manifest error by declining to appoint defendant new counsel.

¶ 51                                III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 53    Affirmed.